KELLERMAN (UNITED STATES v.). See Case No. 15,513.

---

## Case No. 7,655.

### In re KELLEY.

[2 Lowell. 339;[1] 9 Am. Law Rev. 167.]

District Court, D. Massachusetts. Sept., 1874.

EXTRADITION—WARRANT FOR ARREST — APPLICATION TO PRESIDENT—TREATY WITH GREAT BRITAIN 1842—MANSLAUGHTER.

1. A judge of the United States has authority to issue his warrant for the arrest of a supposed criminal, under the extradition treaty with Great Britain, and the statutes passed to aid in carrying that and similar treaties into effect, when due complaint is made to him, without a previous application having been made to the president.

[Cited in Re Thomas. Case No. 13,887; Castro v. De Uriarte, 16 Fed. 96.]

2. In the treaty of 1842 with Great Britain (8 Stat. 576), manslaughter is not one of the enumerated crimes, and it is not included in murder, which is therein mentioned.

Extradition. Hearing before the district judge upon a complaint charging Peter Kelley with murder committed on board a British vessel on the high seas, and asking for his extradition.

F. Dabney, for petitioner.

W. A. Hayes, Jr., Asst. Dist. Atty., for complainant.

[2][LOWELL, District Judge. I feel bound to explain why I issued my warrant on the sworn complaint of the consul without waiting for an executive mandate. The practice established in the Second circuit, which includes the city of New York, where these cases more frequently occur, requires such a mandate. But a careful examination of the origin of the practice, and of the reasons for its adoption. have satisfied me that it ought not to be followed in a case now arising in another circuit. In Kaine's Case, 14 How. [55 U. S.] 103, a practice was approved by four of the judges which seemed to three of their brethren to be dangerously loose; and the point now under review was one of those upon which they differed. Both sides were argued by the judges with great ability; but the questions were not decided, because one of the eight judges joined with the four in denying the writ of habeas corpus, upon a point which did not touch the merits. When, therefore, the case came back to the circuit, Mr. Justice Nelson felt bound to follow his

---

[1] [Reported by Hon. John Lowell. LL. D., District Judge, and here reprinted by permission.]

[2] [From 9 Am. Law Rev. 167.]

own convictions (Kaine's Case [Case No. 7,597]), and that case has of course been taken as a precedent in the circuit (Henrich's Case [Id. 6,369]; Farez's Case [Id. 4,644]). The matters of evidence upon which he commented have been corrected by legislation (Act of June 22, 1860; 12 Stat. 84); but congress has made no change in the practice now in question. It is plain, from a study of the opinions of the learned judge in the supreme court and on the circuit, that he thought there was danger of these cases becoming a matter of mere routine. The key to his whole protest is found [in Re Kaine], 14 How. [55 U. S.] 139, where he expresses this fear. He insisted, very properly, that extradition might involve questions of great delicacy and of political consequence. upon which the deliberate judgment of the president ought to be exercised. All this is true; but both the treaty and the statute provide for such a judgment, though they contemplate that it should be made up after, and not before, the judicial investigation, as it evidently should be, not only to diminish the chances of the escape, but also that the whole case should be prosecuted before the final authority shall be called in to decide it. The treaty says: "The respective judges, &c., shall have power, jurisdiction, and authority, upon complaint made upon oath, to issue a warrant for the apprehension of the fugitive or person so. charged, that he may be brought before such judges, or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper executive authority, that a warrant may issue for the surrender of such fugitive." The statute follows the treaty almost literally, but guards against the inference which might be drawn from the concluding words which I have cited, that the duty of the executive is merely ministerial, by adding that the judge shall certify all the evidence, as well that originally submitted as that taken before him at the hearing, to the secretary of state. 9 Stat. 302.

[Now, it is apparent that the only possible occasion for certifying all the evidence is that the secretary and president may exercise their own judgment upon it, and accordingly we find that this is done. In the recent case of [Joseph Stupp, alias] Carl Vogt [Case No. 13,502], the secretary overruled a learned judge on a question of law, and refused a warrant, which the judge had decided to be demandable, as of right, under the treaty with Prussia. Whether this practice was adopted in deference to Judge Nelson's vigorous argument I know not; but it is sound, and meets his objections, and that at the true point of time, when only a decision can be rendered with a full understanding of the case. It is true. as is remarked by Nelson, J.. that the English statute takes up the matter by the other end, and requires an executive warrant to precede the examination by the magistrate; but this is a clumsy and imperfect mode, and is strongly objected to by a judicious and learned English writer, the only one who has treated this subject. After mentioning the imperfect operation of the English law and some remedies which had been suggested, this writer says: "The principal cause of the practical failure of the treaties is felt at an earlier stage of the proceedings. At present a demand has to be made upon the English government, and documentary evidence submitted to the secretary of state. His warrant being issued, an application has then to be made to a magistrate." He goes on to show how much opportunity this course of proceeding gives for the escape of the criminal; and says that out of four cases in which the executive writ was granted under the convention with France, it was after so long an interval that only in a single case was the fugitive surrendered. "The obvious remedy for this," he adds, "would be to give to any magistrate the power of issuing a warrant of arrest upon complaint made before him, without any previous authorization from the secretary of state. This is the law in Canada, and has there been found to produce no ill result." Clarke, Extr. pp. 107, 108. Turning to the law of Canada, which is given on page 53 of the same treatise, we find language almost identical with that in our treaties and statute, giving power to magistrates to issue the warrant; and it is preceded by a recital that this mode is adopted "for preventing the escape of any person so charged, before a warrant can be obtained from the governor." This law had been in force in Canada for years before the treaty with Great Britain was made, in 1842; and I have little doubt that the mode of proceeding pointed out by the treaty and followed by the statute was adopted for the very purpose of preventing the unnecessary and dangerous delays, and the virtual severing of the true order of things which followed from making the executive examination first, and the judiciary afterwards.

[In such a case as is now before me, of a seaman brought into one of our ports at the end of a voyage in the progress of which the crime had been committed, the execution of the treaty would be simply impossible, if an executive warrant must be obtained from Washington before a seaman could be lawfully detained. Considering the strong reasons, as well as the great preponderance of authority against the practice,—a preponderance which I find in the treaty itself, in the statute, and in the opinions of the greater number of the judges who have considered the question,—and further that the reasons in its favor have lost their force in the present state of practice in the state department, I feel constrained to refuse to establish it in this district. I am credibly informed that in Robbins's Case [Case No. 11,878], which lately

occurred before Judge Shepley, in the district of Maine, the warrant was issued without a previous exequatur from the executive department, the case was heard before a commission specially appointed for the purpose, and was duly certified to the secretary of state, who decided, upon the merits, that as the death of the wounded man occurred in Maine, and he could, therefore, be tried in either country, he should be tried here. This was in accordance with the rule laid down by a majority of the justices of the queen's bench in 5 Best & S. 645. But no objection was taken to the mode of proceeding. I may add that this practice really reconciles the opinions of both the majority and the minority in 14 Howard, the former of whom insisted on the impropriety of the judges obtaining leave to try a case from the executive, and the latter the danger of such a case being considered one of purely judicial cognizance.

[Coming now to the evidence, it is entirely clear that it makes out a case of manslaughter. This crime is not provided for by the treaty, which enumerates murder, assault with intent to commit murder, piracy, arson, robbery, and forgery. It was suggested that possibly the word "murder" might include manslaughter. But considering that both these words have the same meaning in England and America, and that all the words in the treaty are strictly descriptive of well-known crimes whose definition is not at all doubtful, this construction cannot be admitted. As well might we infer that robbery included theft, or piracy mutiny. In all the discussions upon the subject it is assumed, though I am not sure whether there is any reported case that decides it, that murder is used in its legal sense. If all unjustifiable homicide had been intended, it would have been so expressed. Prisoner discharged.] [3]

[The following is the revised opinion of Judge Lowell, as reported in 2 Low. 339:]

LOWELL, District Judge. I issued the warrant upon a sworn complaint made by H. B. M. consul at the port of Boston; and gave at length my reasons for not requiring a mandate from the president of the United States, to precede the arrest. The practice at this time in the Second circuit was to wait for such a mandate (Kaine's Case [Case No. 7,597]; Henrich's Case [Id. 6.369]; Farez's Case [Id. 4,644]); and I explained how that practice had arisen, and endeavored to show that it was unsound. As the practice of the Second circuit has been changed, and accords with that of the First, and of all the others so far as I know, and as the treaty and statute are plain, I have not thought to print the argument, but merely reaffirm the point. See Re MacDonnell [Id. 8,771].

Upon the evidence I find that the crime committed was manslaughter; and this is not within the treaty, which mentions only murder, assault with intent to commit murder, piracy, arson, robbery, and forgery. It was suggested that murder might include manslaughter. But considering that both the law and the language of the two countries are alike, and that the treaty describes well-known crimes by their technical names, this construction is inadmissible. As well might we hold that robbery includes theft; or piracy, mutiny. In an extradition treaty the greater crime does not include the lesser, because the intent is to deliver up great criminals only. Prisoner discharged.