Ex parte SCHORER.

(District Court, E. D. Wisconsin. June 10, 1912.)

1. EXTRADITION (§ 10*)—INTERNATIONAL—PROCEDURE—PRELIMINARY DEMAND.

In the absence of treaty provisions requiring it, a demand for the extradition of a fugitive from justice is not a step necessary to be taken before the institution of proceedings for his return, which may be prosecuted before an extradition commissioner by a foreign country, under Rev. St. § 5270 (U. S. Comp. St. 1901, p. 3591), without any precedent formalities.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. § 11; Dec. Dig. § 10.*]

2. EXTRADITION (§ 12*)—INTERNATIONAL—PROCEDURE—WARRANT OF ARREST.

In proceedings for the extradition of an alleged fugitive from justice by a foreign country under Rev. St. § 5270 (U. S. Comp. St. 1901, p. 3591), it is not necessary to produce before the commissioner any warrant of arrest or other equivalent document issued by a foreign magistrate.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. § 13; Dec. Dig. § 12.*]

3. EXTRADITION (§ 14*)—INTERNATIONAL—PROCEDURE—DEPOSITIONS.

Act Aug. 3, 1882, c. 378, § 5. 22 Stat. 216 (U. S. Comp. St. 1901, p. 3595), which provides that, in extradition proceedings, copies of depositions shall be received in evidence if authenticated so as to entitle them to be received in the tribunals of the demanding country which may be shown by the certificate of the principal diplomatic or consular officer of the United States resident in such country, supersedes the requirement of Rev. St. § 5271 (U. S. Comp. St. 1901, p. 3593), that such copies shall be attested by the oath of the person producing them, and such attestation is not necessary.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 15, 16; Dec. Dig. § 14.*]

4. EXTRADITION (§ 14*)—INTERNATIONAL—HEARING BEFORE COMMISSIONER—EVIDENCE.

Evidence offered before an extradition commissioner to sustain charges of forgery and the utterance of forged bills of exchange in Bavaria by

an alleged fugitive from justice reviewed in a habeas corpus proceeding, and *held* competent and sufficient to authorize the commissioner to exercise his judgment thereon.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 15, 16; Dec. Dig. § 14.*]

5. CRIMINAL LAW (§ 371*)—ADMISSIBILITY OF EVIDENCE—INTENT AND KNOWLEDGE.

To sustain charges of forgery and the utterance of forged paper, evidence that the accused had in his possession and disposed of a large number of other forged bills and acceptances of similar character to those upon which the charges are based is competent upon the questions of knowledge and intent.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830–832; Dec. Dig. § 371.*]

6. EXTRADITION (§ 14*)—INTERNATIONAL—SCOPE OF INQUIRY BEFORE COMMISSIONER.

In proceedings for the extradition of an alleged fugitive from justice of a foreign country charged with a crime specified in the treaty and also enumerated in Rev. St. § 5270 (U. S. Comp. St. 1901, p. 3591), the commissioner is not required to make extended inquiry as to the scope of the criminal jurisprudence of the demanding country, but is limited to determining whether there is sufficient evidence of criminality to justify holding the accused for the particular offense, as we understand that offense by its description in the treaty and in our laws.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 15, 16; Dec. Dig. § 14.*]

On petition by Michael Schorer for a writ of habeas corpus. Dismissed.

See, also, 195 Fed. 334.

E. J. Henning, of Milwaukee, Wis., for petitioner.

H. H. Barnum, of Chicago, Ill., and Emil Wallber, of Milwaukee, Wis., for German Government.

GEIGER, District Judge. On May 8th Michael Schorer filed his petition for a writ of habeas corpus to test the legality of his detention by the United States marshal of this district.

The petitioner and one Hans Boessl were arrested in November, 1911, as alleged fugitives from justice from the kingdom of Bavaria, charged with the crimes of forgery and the utterance of forged acceptances or bills of exchange. They were committed to jail; but subsequently discharged because the United States commissioner entertaining the proceedings had not been authorized to act as an extradition commissioner. Second extradition proceedings were instituted, and upon such they were committed to await the action of the executive department. They again sued out a writ of habeas corpus, upon which they were discharged upon the ground that the record failed to disclose an executive mandate or requisition and failed to show a prima facie case of guilt. On the 16th day of March, 1912, the petitioner, Schorer, was again arrested by virtue of a warrant issued by an extradition commissioner upon a complaint charging him with being a fugitive from justice from the kingdom of Bavaria, having there committed the crimes of forgery and the utterance of forged

papers specified in the complaint. Thereupon a hearing was had before the commissioner, resulting in an order committing the petitioner to the custody of the marshal to abide the order of the Secretary of State of the United States. The record of such proceedings is before the court pursant to a writ of certiorari.

The petitioner attacks the proceedings upon the following grounds:

(1) That no mandate or demand upon the United States for the extradition of the accused has been produced or proven in the proceedings.

(2) That no warrant or equivalent of a warrant of any tribunal of the demanding country has been produced.

(3) That the copies of depositions taken in the demanding country and received by the commissioner are not properly certified.

(4) That no prima facie case of forgery or utterance of forged papers by the accused has been made.

(5) That there is no competent evidence in the record upon which the commissioner could exercise his judgment.

(6) That there is no evidence in the record showing that utterance of forged papers is a crime under the laws of Bavaria or of the German Empire.

These will be considered:

[1] First. The rule is well settled that, unless there is a provision in the treaty, a demand by one country upon another for the extradition of an alleged fugitive is not a step necessary to be taken prior to, or to be proven in, the proceedings before the extradition commissioner, pursuant to section 5270, R. S. U. S. Likewise, unless treaty stipulations require another or a different course to be pursued, the foreign country is authorized to institute the proceedings under the section named without any precedent formalities. Some confusion has arisen because of a failure to distinguish between cases where the treaty contains stipulations respecting procedure and cases where it is silent, leaving, in the latter case, the statute as the controlling guide in matters before the extradition commissioner.

The treaty provision applicable to this case is as follows:

"Article 1. The government of the United States and the Bavarian government promise and engage, upon mutual requisitions by them or their ministers, officers or authorities, respectively made, to deliver up to justice all persons who, being charged with the crime * * * forgery, or the utterance of forged papers, * * * committed within the jurisdiction of either party, shall seek an asylum, or shall be found within the territories of the other: Provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offense had there been committed; and the respective judges and other magistrates of the two governments shall have power, jurisdiction and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper executive authority, that a warrant may issue for the surrender of such fugitive. * * *" Treaty with Bavaria, Sept. 25, 1853, 10 Stat. 1023.

. It will be seen that the foregoing contains nothing respecting the necessity of a requisition as part of the proceedings or the proof before the commissioner. The agreement to surrender "upon mutual requisition" is common to all treaty provisions, and would probably be implied in any extradition treaty. The necessity either of a requisition or an executive mandate has been resolved against upon the same grounds (Moore, Extradition, § 235)—that is, unless the treaty calls for them as a part of the proceedings before the commissioner—and the most decisive utterance upon this point is contained in the case of Grin v. Shine, 187 U. S. 181, 23 Sup. Ct. 98, 47 L. Ed. 130, where the following language is used:

"It was formerly held that a requisition from the demanding government was necessary to be produced before the commissioner could act (In re Herris [D. C.] 32 Fed. 583), but the opinion in this case was reversed by Mr. Justice Brewer on appeal to the Circuit Court, who held that no preliminary requisition was necessary, as extradition could not be consummated without action by the executive in the last instance, and that the authority of the foreign government to act need not appear in the complaint, if it were made to appear in the examination before the commissioner, or elsewhere in the proceedings. Bearing in mind the frequent necessity for immediate action in case the whereabouts of the accused is ascertained, the delay necessary to procure a preliminary requisition might often result in the defeat of justice. In Kaine's Case, 14 How. 103, 129 [14 L. Ed. 345], this court was nearly equally divided upon the question whether a preliminary mandate from the executive was necessary. So long as Mr. Justice Nelson, who thought such mandate necessary, remained upon the bench, his opinion was followed in the Second Circuit (In re Henrich, 5 Blatch. 414 [Fed. Cas. No. 6,369]; In re Farez, 7 Blatch. 34, 45 [Fed. Cas. No. 4,644]), but since that time a different view has been taken of the question (In re MacDonnell, 11 Blatch. 79 [Fed. Cas. No. 8,771]; In re Thomas, 12 Blatch. 370 [Fed. Cas. No. 13,887]). Judge Lowell's opinion accorded with the later, and, as we think, the sounder view. In re Kelley, 2 Lowell, 339 [Fed. Cas. No. 7,655]. See, also, Benson v. McMahon, 127 U. S. 457 [8 Sup. Ct. 1240, 32 L. Ed. 234]."

In the case of In re Herris (D. C.) 32 Fed. 583 (s. c. [C. C.] 33 Fed. 165), and in the later cases above referred to, the necessity for such mandate was resolved against principally because the treaty makes no provision therefor, and, secondly, because extradition must ultimately result through the action of the executive department. These cases explain what is meant in the quotation from Grin v. Shine, supra, that the mandate or authority need not appear in the complaint if it is made to appear in the examination before the commissioner or elsewhere in the proceedings. This latter clause undoubtedly means that the demand of the foreign government must be made to appear to this government some time or somewhere in the whole proceedings from their initiation down to their consummation by the executive. All of the later authorities clearly indicate that the usual diplomatic requisition is no concern of the extradition commissioner, but that his functions under section 5270 are limited to the matters therein stated, viz., the determination of the sufficiency of the evidence "to sustain the charge." The treaty above referred to clearly contemplates nothing more. I may add that in the present proceeding the extradition commissioner requested the Secretary of State to furnish to him copies of the foreign or executive action relating to the petitioner, conceiving

that it was necessary to incorporate the same in the record in order to meet the suggestions contained in a former decision upon the previous application by the petitioner and Boessl. The Secretary of State while furnishing copies requested stated to the commissioner, on the authority of Benson v. McMahon, supra, that the state department deemed such evidence wholly unnecessary in the proceedings before the commissioner. That such appears to have been the view of the state department for many years is also assigned by Judge Blatchford (In re Thomas, 12 Blatch. 378, Fed. Cas. No. 13,887), as the reason for refusing to follow the earlier rulings upon this subject. All this is, of course, not inconsistent with the requirement that the commissioner should at some stage of the proceeding be satisfied that the proceedings are instituted on behalf of the foreign government; that is, they should not proceed merely upon private information nor be supported by private interests. It is noteworthy, however, that the record need disclose only slight evidence of the fact that the foreign government has initiated the proceedings. See Benson v. McMahon, supra.

[2] Second. The petitioner's second contention is fully met by either one or both of the following considerations:

(a) It is not necessary to produce before the commissioner any warrant or equivalent of a warrant of any tribunal of the demanding country. In Grin v. Shine, supra, involving the Russian treaty (which requires the production of such warrant), Mr. Justice Brown, after holding that the treaty provision had been complied with, says (187 U. S. page 191, 23 Sup. Ct. page 102, 47 L. Ed. 130):

"But there is another consideration in this connection which should not be overlooked. While the treaty contemplates the production of a copy of a warrant of arrest or other equivalent document issued by a magistrate of the Russian Empire, it is within the power of Congress to dispense with this requirement, and we think it has done so by Rev. Stat. § 5270, hereinbefore cited. The treaty is undoubtedly obligatory upon both powers, and, if Congress should prescribe additional formalities than those required by the treaty, it might become the subject of complaint by the Russian government and of further negotiations. But, notwithstanding such treaty, Congress has a perfect right to provide for the extradition of criminals in its own way with or without a treaty to that effect, and to declare that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient. Castro v. De Uriarte [D. C.] 16 Fed. 93. This appears to have been the object of section 5270, which is applicable to all foreign governments with which we have treaties of extradition. The requirements of that section, as already observed, are simply a complaint under oath, a warrant of arrest, evidence of criminality sufficient to sustain the charge under the provisions of the proper treaty or convention, a certificate by the magistrate of such evidence and his conclusions thereon to the Secretary of State. As no mention is here made of a warrant of arrest, or other equivalent document, issued by a foreign magistrate, we do not see the necessity of its production. This is one of the requirements of the treaty which Congress has intentionally waived. Moore on Extradition, § 70."

(b) The record in the present case discloses an authenticated copy of a document, signed by "The Examining Magistrate of Royal Superior Court of Munich, Meidinger, Royal Councillor," to which is attached the court seal, and which, after description of the accused, recites the charge made against him, the provisions of the German

Penal Code, his flight and probable guilt, and concludes with, "the arrest of Schorer for the purpose of being placed under examination is ordered because the accused has fled." This is sufficient. "If not a warrant of arrest, it is an equivalent judicial document issued by a judge or magistrate authorized to do so." Grin v. Shine, supra, 187 U. S. 190, 191, 23 Sup. Ct. 102, 47 L. Ed. 130.

[3] Third. It is claimed that the depositions offered and received by the commissioner are not properly authenticated, and should not have been received. While it may be doubted whether this contention can be reviewed on habeas corpus, it is nevertheless conceded that the consular authentication affixed to the copies of the depositions is in the precise form required by the statute. Section 5, 22 Stats. at Large, 216; Act Aug. 3, 1882. Counsel contends that although this act amending section 5271, U. S. Stats., as it originally stood, repealed said last-named section only so far as it was inconsistent therewith, yet the original clause of such section requiring the copies of depositions to be attested "upon the oath of the party producing them to be true copies of the original depositions" has not been eliminated from the required method of procedure in the admission of evidence in extradition cases. It seems to me that the amending act was clearly designed to prescribe a single test of admissibility of evidence in proceedings in this country, and it certainly by its clear language eliminated the clause relating to attesting copies of depositions when it provided that such depositions "or the copies thereof" shall be received when authenticated by the certificate, etc., of the principal diplomatic officer. In other words, the amending statute intended to make the consular certificate the final and controlling guide in determining the admissibility of testimony before the extradition commissioner. When the documentary evidence has been authenticated as required by the statute, it is admissible, leaving to the commissioner merely the question of determining the sufficiency of the evidence therein contained. Elias v. Ramirez, 215 U. S. 398, 30 Sup. Ct. 131, 54 L. Ed. 253.

[4] Fourth. A consideration of the fourth and fifth claims made by the petitioner, that no prima facie case of forgery or utterance of forged papers is presented, and that there is no competent evidence in the record upon which the commissioner could exercise his judgment, necessitates a review of the evidence. The facts are: The petitioner and one Hans Boessl were engaged during the years 1910 and 1911 in conducting a banking, loan, and brokerage business in Munich, Bavaria, under the firm name of Hans Boessl. The petitioner had been a bookkeeper. The date of his association with Boessl is not fixed, but during its continuance in the years stated they appear to have done an extensive business, dealing in commercial paper, principally accepted drafts, many of which they sold to bankers or other investors. Although an effort is made by the petitioner in his testimony to minimize his interest, or his substantial pecuniary connection with the firm, there is an abundance of testimony to show that he held himself out as a partner. He admits a one-half interest in any profits, and he professed to be actively financially interested in the business.

Very likely Boessl's activities in the conduct of the office work were greater than the petitioner's. The latter seemed to be an outside manager, a "procurist" as he is called, or a solicitor of patronage in the sale or discount of acceptances or commercial paper in their hands. He, however, attended to some of the bookkeeping, and had an admittedly active part in the daily business of the firm. The particular complaint in these proceedings charges the petitioner with having forged and having uttered, knowing the same to be forged, 49 bills of exchange or drafts purporting to have been accepted by persons whose names were written thereon as acceptors. The demanding government in order to show the complicity of the accused in the alleged forgeries, as well as his knowledge of such forgeries, proved, by depositions taken in Germany, the possession and utterance by the petitioner of eighty other acceptances, drafts, or bills of exchange, also forgeries, of the same general tenor as those described in the complaint; so that the commissioner had before him in the present proceeding testimony respecting one hundred and twenty-nine different acceptances or bills of exchange, upon each one of which appeared the names of Schorer or Boessl, or both, each one of which was pronounced by the alleged acceptors, and in some cases the drawers, to be undeniably forged and false. The extent of the connection of the petitioner with these forged documents, as disclosed by his name thereon, is shown by the fact that of the 49 documents described in the complaint 32 are signed by him as maker. Of the 80 additional drafts and acceptances proved before the commissioner, 46 are signed by him as maker. So that of the total of 129 such bills, 78 appear to have been signed by him as maker. It further appears that upon practically all of these alleged spurious bills the names of both Schorer and Boessl appear as indorsers; or, to be more specific, of the 49 bills described in the complaint the petitioner and Boessl jointly indorsed 40. The petitioner Schorer indorsed 5 alone, either as an individual or on behalf of Boessl, and Boessl indorsed 4. Out of the 80 additional bills the petitioner and Boessl jointly indorsed 72, while but eight were indorsed either by the petitioner alone or by Boessl alone.

A further characteristic disclosed is that the great majority of the bills were addressed to certain persons whose names and addresses and occupations (principally farmers) were particularly stated, which persons, in turn, became the alleged acceptors of the bills. In nearly one-third of them the alleged acceptor appears to be the husband or wife of the alleged drawer. In fact, all but a dozen of the bills are drawn either by Schorer, or are of the character last above described. It is disclosed that some of the alleged makers or acceptors of what are proven to be spurious bills had in fact transacted legitimate business with the accused and his partner. Many of the bills are pronounced spurious by the persons whose names appear thereon as acceptors, who further state that they have had no business transactions whatever with the accused or his partner, and that, in fact, they have never drawn or accepted a bill of exchange. In examining the copies of the drafts carefully they disclose some remarkable coincidences re-

specting dates and the use of names. In some of the instances, where the wife becomes a party to a draft upon her husband, one or the other name appears upon other drafts, in turn, executed by the petitioner as maker. Although the record contains intimations of the falsification of drafts and acceptances prior to such time, those which are introduced in evidence bear date beginning approximately in April, 1911, with various maturities, as late as February, 1912, the greater number, however, maturing at or about the time of the flight of the accused and Boessl in October, 1911.

It appears beyond question that the accused, Schorer, solicited from various persons, investors, bankers, and money lenders their patronage in purchasing the bills and acceptances referred to in the testimony, and many others during the time above stated. The success in selling the paper was doubtless due to the liberal discounts which were offered, but also to representations made, particularly by the accused, respecting the quality of the paper offered. Among other representations were the following: That the accused and Boessl had lent such money to the alleged acceptors, or, in the event of the purchase by the proposed patron, such money would be immediately turned over to such acceptor; that the various acceptors were persons of good financial standing, the latter representation being in most cases supported by recommendations of credit of the nature of commercial reports, and, further, by representations or professions on the part of the accused and his partner of their own financial responsibility, and by other representations tending to inspire confidence, and to induce the purchase of the paper and securities offered. One witness testifies to a representation made by the accused that the acceptances were in fact secured by real estate mortgages. In all these transactions the accused assumed an attitude of a personal ownership or interest in the paper offered for sale, and both he and his associate gave their indorsements freely to induce sales.

Another fact appearing in the testimony is the use of wrong Christian names of the wives or husbands of the acceptors or drawers, and in one or two instances the use of a fictitious name was disclosed. The accused had a habit, when paper matured, of paying the amount, either in cash or more frequently by inducing the holders of the acceptances to take new or other similar acceptances. When some of the acceptances were held by banks, the money or new acceptances to pay the same was brought by the accused usually a few days in advance of maturity. The purpose of this is not expressly disclosed, but doubtless it was to preclude notice being sent by the then holders to the persons appearing to be acceptors. On or about the 1st day of October the holder of one or more of the acceptances, having notified the acceptor of the maturity thereof, and being in turn notified that such acceptance was false and forged, remonstrated with the partner of the petitioner. It also appears that the accused learned of such remonstrance; that he himself had paid to the holder of one of the alleged forged acceptances the amount thereof.

On or about October 5, 1911, both Boessl and Schorer left Munich without in any way closing up their business affairs, and came to the

United States. It appears, further, that they were companions upon their trip, and that each traveled and while in this country remained under an assumed name. The petitioner had stated before his departure that he intended to go to America upon an extended absence, giving among other things as a reason that commercial paper would be maturing which he would be unable to pay. It further appears, though by testimony much of which is infirm because hearsay, that both the accused and Boessl for a considerable time before their departure were leading a fast life, indulging among other things in gambling and betting at horse racing.

After the first arrest of the petitioner he signed a written confession of his guilt. This document is in evidence. It is general, and does not pertain to any particular act charged in the complaint, but does state that before his departure from Germany on October 5, 1911, he "repeatedly forged drafts together with one Hans Boessl, alias M. Donanbauer, and that about eight persons were wronged thereby to the total amount of 60,000.00 to 70,000.00 marks." He further states that he pleads guilty, and would willingly reimburse the amount embezzled "if he were in position to do so." It therefore clearly shows an intention to admit his guilty participation in the transactions referred to in the complaint and the testimony. Upon the hearing before the commissioner and during the argument, the effect of such written confession was sought to be minimized by the claim that the accused did not know what he was doing, and that he was under great mental anxiety. However, the consular representatives testified that the conversations attending the alleged act of confession were in the German language, the written document is in such language, and it is undoubted that the accused read it before signing.

The accused upon the hearing before the commissioner took the stand in his own behalf, and the following is given as a résumé of his testimony:

He denies forging the name of certain 20 or 25 alleged acceptors specified in questions asked him; denies generally having been guilty of forging any acceptances or uttering the same knowing them to be forged. He admits his own signature in the making and indorsing of the acceptances referred to in the evidence; admits knowing some of the alleged acceptors; denies knowing others. The course of dealing described by the bankers and money lenders who were patrons of the accused and his copartner, so far as the accused participated therein, is, in general, admitted. No attempt is made to particularly explain the possession of the various alleged forged documents, other than to broadly intimate that so far as he, the petitioner, participated in the possession or utterance of the same, he was acting upon the suggestion and direction of his partner Boessl. No attempt is made to explain his flight other than by the suggestion that he felt his inability to meet the large number of maturing obligations and his desire not to face the impending financial disaster. No explanation is given of the assumption of another name, except that he paid no particular attention to it, and that other people "in

higher society" frequently do so. No claim is made that the alleged forged documents came to the possession of himself or his copartner, Boessl, from the hands of others. The inference from the other testimony that the petitioner and his partner reaped the benefits of the sale of the forged documents is in no way met or explained.

As a summary of the evidence the following is shown:

First. That at or about the time mentioned in the complaint the accused and his associate had in their possession upwards of 129 forged acceptances or bills of exchange.

Second. That practically all of such bills of exchange had upon the same as maker or indorser the name of the accused, Micheal Schorer, written thereon by himself.

Third. That each and all of such acceptances or bills of exchange is and are pronounced false and forged by the person or persons other than the accused or Boessl, named therein as makers, drawers, or acceptors.

Fourth. That such forged acceptances and bills of exchange came into existence in or about the office, banking house, or business occupied and conducted by the accused and his partner Boessl; and none of such acceptances was in fact procured by them through any transactions had with any other persons.

Fifth. That the business of the accused and his partner, Boessl, was conducted by them without material assistance from any other person or persons whatsoever.

Sixth. That the accused was in possession of these various forged acceptances and bills of exchange and sold or uttered the same, as detailed in the evidence.

Seventh. That in selling and uttering such acceptances the accused made representations respecting the character and origin thereof, the previous alleged dealings between himself and his copartner and the alleged acceptors, which were false.

Eighth. That the accused in at least one instance, for the purpose of inducing the purchase of a forged acceptance, represented that it was secured by a mortgage, which representation was false to his knowledge.

Ninth. That on October 5, 1911, the accused and his partner fled from Munich, leaving their place of business and all pertaining thereto without arranging for attention to the same or any of their private affairs, traveling and remaining here under assumed names.

It must be borne in mind that the accused was not on trial before the commissioner for the crimes charged. The only question to be determined by the commissioner was that of probable cause; or, to use the language common in treaties, whether there was such evidence of criminality as will justify the apprehension and commitment; and it must likewise be borne in mind that upon habeas corpus the question is narrowed down to determining whether there is any legal evidence upon which the extradition commissioner could exercise his judgment or discretion. In re Bryant, 167 U. S. 104, 17 Sup. Ct. 744, 42 L. Ed. 94. Upon the record the fact of forgery and the actual utterance of forged instruments by the accused are es-

tablished, in fact, are practically conceded. To fix upon one a participation in the act of forgery or to establish that he had a guilty knowledge of the spurious character of an instrument when he uttered it is rarely susceptible of direct proof, and hence, as I view it, practically the only question to be determined is whether there is any competent proof which will justify the inference of probable guilt of the accused in committing the forgery, or a guilty knowledge of the forgery at the time he uttered the various acceptances described in the complaint and evidence. The demanding government relies chiefly upon the inferences to be drawn from (1) the possession by the accused of a large number of forged acceptances; (2) his actual utterance of these instruments; (3) the false representations made by him respecting the character of the acceptances, their origin and the relation which he and his partner bore to the alleged acceptors; (4) the flight of the accused and his partner; (5) the confession.

[5] The competency of the foregoing evidence and the legitimate inference to be drawn therefrom in proof of the crimes of forgery or utterance of forged paper above specified is so clearly and unequivocally stated in numberless cases that no doubt need be entertained on the subject. The rules are recognized as exceptions to the general doctrine that the commission of one crime cannot be proven by the commission of another. The guilty knowledge, intent, or design of the accused being in issue, collateral circumstances must, in the absence of direct proof or admissions, be resorted to to establish the same as facts. As stated by Mr. Wigmore in his work on Evidence (vol. 1, § 312), in speaking of proof of other utterings as evidence of intent, says:

"The principle here applicable proceeds merely upon the doctrine of chances. It does not attempt to show knowledge or any other possible element of intent; but it endeavors to negative inadvertence and any other innocent explanation. It argues that, the oftener a like act has been done, the less probable it is that it could have been done innocently."

Again (section 317):

"The very kernel of the principle (either of knowledge or of intent) is that the fact of the uttering tends in one way or another to show the defendant's knowledge at the time in issue either by the probable warning received or by the improbability of innocent intent in repeated instances; and the assumption throughout is that the bare fact of utterance tends to show this."

The following cases announce and apply the same rules: Dillard v. United States, 141 Fed. 308, 72 C. C. A. 451; Commonwealth v. Russell, 156 Mass. 196, 30 N. E. 763; People v. Everhardt, 104 N. Y. 591, 11 N. E. 62; Commonwealth v. Coe, 115 Mass. 481; Glucksman v. Henkel, 221 U. S. 508, 31 Sup. Ct. 704, 55 L. Ed. 830.

So, too, the rule is well settled and has been repeatedly applied that the mere possession of forged instruments raises a presumption that the party so in possession thereof either forged it or consented to the forging, and that, in any event, the burden is cast upon one having the possession of or uttering forged instruments to give some reasonable account of his own relation thereto; and, unless he is

able to do so, the inference of guilty participation or guilty knowledge must go against him. 1 Wigmore on Evidence, supra; State v. Peterson, 129 N. C. 556, 40 S. E. 9, 85 Am. St. Rep. 756; State v. Milligan, 170 Mo. 215, 70 S. W. 473; People v. Rathbun, 21 Wend. (N. Y.) 509; Hobbs v. State, 75 Atl. 1; State v. Williams, 66 Iowa, 573, 24 N. W. 52; State v. Allen, 116 Mo. 548, 22 S. W. 792. Whether the inferences or presumptions to be drawn from these circumstances are weak or strong is not material on this review. It is sufficient that the evidence is competent and justifies the inferences. It is sufficient in the present case to say that the circumstances of the possession and utterance by the accused, not only of the acceptances described in the complaint, but the many others detailed in the evidence, the false statements and representations made by the accused to the various persons who purchased these acceptances, the flight of the accused, his confession, preclude any rational inference except that of probable guilt. Whatever shortcomings there may be in the evidence in a failure to fix upon the accused a guilty participation in forging any particular acceptance, or a guilty knowledge of the forged character of any which he uttered, is in my judgment wholly overcome by the ample evidence in the record to show his guilty participation in what seems to have been a plan or system, or design of defrauding by means of these forged documents. If the charge against him were limited to one or a very small number of forgeries or utterances, the testimony might be criticized; but upon this record, which discloses the possession and utterance by the accused, either alone or in concert with Boessl, of 129 forged acceptances, aggregating in their face value something like 180,000 marks, it would be little less than a reproach, in view of all the other circumstances, to decline to accept the natural and legitimate inferences to be drawn. A contrary inference is impossible, except it be based upon conjecture. It is always possible to conceive that the accused might be an innocent victim of circumstances; but, if an extradition commissioner has drawn the permissible inferences of guilt, it is beyond the province of the court on habeas corpus to reject them. We may note that the testimony given by the accused before the commissioner, although it consisted of denials, called for nothing more than the exercise of the commissioner's discretion in believing it or disbelieving it. It could not render incompetent the other testimony, and whether it was worthy of belief, whether the accused fairly met the inculpating circumstances with which he was confronted, was within the peculiar province of the commissioner to determine; and such determination is not reviewable on habeas corpus.

[6] Fifth. The last claim made by the petitioner, that there is no evidence showing that the utterance of forged paper is a crime under the laws of Bavaria, is without merit. The record discloses sufficient of the Penal Code of Germany to show that the substance of the crime of uttering forged paper is the same in that country as here. I do not believe, however, that such question is the subject of inquiry before an extradition commissioner, unless required by treaty stipulation or act of Congress. The treaty specifies the extraditable

crimes, and, when under section 5270 a complaint is lodged charging the commission of an offense covered by the treaty stipulation, the commissioner is not obliged to make extended inquiry as to the scope of the criminal jurisprudence of the demanding country, but is by the statute limited to determining whether there is sufficient evidence of criminality to justify holding the accused for the particular offense, as we understand that offense by its description in the treaty and in our laws. I am satisfied that there is nothing whatever upon which to base any attack upon the jurisdiction of the commissioner, nor, indeed, any reasonable doubt as to the correctness of his determination of the one question before him. We are not called upon to review the proceedings in the light of the strict rules or technicalities of criminal proceedings, but rather in recognition of a duty to fairly and faithfully perform the treaty obligations respecting surrender of alleged fugitives. "Care should doubtless be taken that the treaty be not made a pretext for collecting private debts, wreaking individual malice, or forcing the surrender of political offenders; but, where the proceeding is manifestly taken in good faith, a technical compliance with some formality of criminal procedure should not be allowed to stand in the way of a faithful discharge of our obligations. Presumably, at least, no injustice is contemplated, and a proceeding which may have the effect of relieving the country from the presence of one who is likely to threaten the peace and good order of the community, is rather to be welcomed than discouraged." Grin v. Shine, supra. "It is common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law. But it is a waste of time; for while, of course, a man is not to be sent from the country merely upon demand or surmise, yet if there is presented, even in somewhat untechnical form according to our ideas, such reasonable ground to suppose him guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender." Glucksman v. Henkel, supra.

The writ of habeas corpus and the writ of certiorari must each be discharged, and the petitioner remanded to the custody of the marshal, to be held by him pursuant to the order of the extradition commissioner.