# BENSON v. McMAHON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF NEW YORK.

No. 1420. Argued May 1, 1888. — Decided May 14, 1888.

On the hearing of an appeal from a judgment of a Circuit Court, discharging a writ of *habeas corpus* which had been issued on the petition of a person arrested for a crime committed in a foreign country, and held for extradition under treaty provisions, the jurisdiction of the commissioner and the sufficiency of the legal ground for his action are the main questions to be decided; and this court declines to consider questions respecting the introduction of evidence, or the sufficiency of the authentication of documentary proof.

When a person is held for examination before a commissioner, to determine whether he shall be surrendered to the Mexican authorities, to be extradited for a crime committed in Mexico, the question to be determined is, whether the commission of the crime alleged is so established as to justify the prisoner's apprehension and commitment for trial if the offence had been committed in the United States; and the proceeding resembles in its character preliminary examinations before a magistrate for the

purpose of determining whether a case is made out to justify the holding of a person accused, to answer to an indictment.

The crime of "forgery," as enumerated in article 3 of the Treaty of Extradition with Mexico of June 20, 1862, is not confined to the English common-law offence of forgery; but it includes the making, forging, uttering, and selling to the public, fraudulent printed tickets of admission to an operatic performance, bearing on their face in print the name of the manager of the operatic company, and also stamped with his name and seal. It seems that such an offence is also included in the crime of forgery as defined by the English common law.

THIS was an appeal from a judgment denying a discharge to a prisoner, on a writ of *habeas corpus*. Petitioner appealed. The case is stated in the opinion.

*Mr. Peter Mitchell* for appellant.

*Mr. S. Mallet-Prevost* and *Mr. De Lancey Nicoll* for appellees.

MR. JUSTICE MILLER delivered the opinion of the court.

This is an appeal from a judgment of the Circuit Court of the United States for the Southern District of New York upon a writ of *habeas corpus*, in which that court remanded the prisoner to the custody of the marshal of the district.

The proceedings were originally instituted by a complaint, made before Samuel H. Lyman, a United States commissioner for the Circuit Court of that district, by one Juan N. Navarro, consul general of the Republic of Mexico at the city of New York, against George Benson, whom he charged with being guilty of the crime of forgery, committed in Mexico, and therefore liable to extradition under the treaty of December 11, 1861, between the United States and Mexico, to be there tried for that offence. The case was heard quite elaborately before Commissioner Lyman, who rendered the following judgment: "After a full and fair examination of the law and the facts in the case, I find that the evidence produced against the said Benson is sufficient in law to justify his commitment for the crime of forgery for the purpose of being delivered up as a fugitive from justice to the Republic of Mexico, pursuant to

the provisions of the said treaty. Wherefore I have committed the said Benson, pursuant to the provisions of said treaty, to the custody of the United States marshal, to be by him held in the proper jail until a warrant for the surrender of the said Benson shall issue according to the stipulation of the said treaty, or he shall be otherwise dealt with according to law."

A writ of *habeas corpus* was thereupon allowed by Justice Blatchford, of the Supreme Court of the United States, directed to Martin T. McMahon, the marshal in whose custody the prisoner, Benson, was held by order of the commissioner, requiring him to produce said prisoner before the Circuit Court of the United States for that district on February 21, 1888, at 11 o'clock in the forenoon; and also a writ of *certiorari* to Commissioner Lyman, directing him to return at the same time the " cause of imprisonment of George Benson, and true copies of the proceedings, complaints, warrants, depositions, trials, examinations, determinations, commitments, and record" had before him.

To this the marshal made return that he held the prisoner by virtue of a commitment of Commissioner Lyman, and the commissioner returned into the court a transcript of all the proceedings had before him, including the testimony and exhibits. Upon the hearing in the Circuit Court it was " Ordered, That the writ of *habeas corpus* be, and the same is, hereby discharged; that the petitioner remain in the custody of the marshal of the United States for the Southern District of New York, pending such application on appeal as petitioner may be advised to make to a Justice of the Supreme Court of the United States, pursuant to the 34th Rule of that court; or until the further order of this court, upon notice by said complainant after twenty days from the date of this order."

Thereupon the petitioner, George Benson, obtained the allowance of an appeal from this judgment of the Circuit Court to this court, by Mr. Justice Blatchford. The matter has been argued very fully before us by counsel for the prisoner and for the Mexican government.

This proceeding was instituted before the commissioner under Title LXVI. of the Revised Statutes of the United

States, concerning extradition. The first section reads as follows:

"SEC. 5270. Whenever there is a treaty or convention for extradition between the government of the United States and any foreign government, any Justice of the Supreme Court, circuit judge, district judge, commissioner, authorized so to do by any of the courts of the United States, or judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within the limits of any State, district, or Territory, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

There is no evidence in this record, at least there is no copy of any demand or requisition made by the Mexican authorities upon our government, for the extradition of this prisoner. The proceedings, therefore, up to this time rest upon the initiative authorized by the statutes upon that subject; the Mexican government, however, being represented by counsel, and the correspondence with its officers which was introduced into the record showing their interest in the matter and their purpose to have this prisoner brought to that country for trial.

The treaty under which this right to arrest the prisoner and detain him for extradition is asserted was concluded at Mexico,

December 11, 1861, and proclaimed by the President of the United States June 20, 1862. 12 Stat. 1199. It has the usual provisions, that the contracting parties shall on requisitions made in their name deliver up to justice persons who, being accused of the crimes enumerated in article 3, committed within the jurisdiction of the requiring party, shall seek an asylum, or shall be found within the territories of the other. The enumeration of crimes in that article is as follows:

"Murder, (including assassination, parricide, infanticide, and poisoning;) assault with intent to commit murder; mutilation; piracy; arson; rape; kidnapping, defining the same to be the taking and carrying away of a free person by force or deception; forgery, including the forging or making, or knowingly passing or putting in circulation counterfeit coin or bank-notes, or other paper current as money, with intent to defraud any person or persons; the introduction or making of instruments for the fabrication of counterfeit coin or bank-notes, or other paper current as money; embezzlement of public moneys; robbery, defining the same to be the felonious and forcible taking from the person of another of goods or money to any value, by violence, or putting him in fear; burglary, defining the same to be breaking and entering into the house of another with intent to commit felony; and the crime of larceny, of cattle or other goods and chattels, of the value of twenty-five dollars or more, when the same is committed within the frontier States or Territories of the contracting parties."

As the case appears before us on the transcript of the evidence produced before Commissioner Lyman, and before the Circuit Court on the writ of *habeas corpus*, it is considerably confused but very full and elaborate. Several questions in regard to the introduction of evidence which were raised before the commissioner, some of them concerning the sufficiency of the authentication of papers and depositions taken in Mexico, and as to the testimony of persons supposed to be expert in the law of that country regarding the subject, are found in the record, which we do not think require notice here. The writ of *habeas corpus*, directed to the marshal of the Southern District of New York, does not operate as a writ of error, and

many of the orders and decisions made by the commissioner at the hearing which took place before him become unimportant in the examination of the sufficiency of the proceedings under which he ordered the prisoner into custody. The main question to be considered upon such a writ of *habeas corpus* must be, had the commissioner jurisdiction to hear and decide upon the complaint made by the Mexican consul; and also, was there sufficient legal ground for his action in committing the prisoner to await the requisition of the Mexican authorities?

In regard to the jurisdiction of the commissioner to hear the complaint no doubt can be entertained. The offence set out in three or four different forms in the petition of Navarro, the Mexican consul general, is distinctly that of forgery on the part of Benson; the particular forgery charged is that of the name of Henry E. Abbey, and the time, place and circumstances are detailed with sufficient particularity to comply with the language of the treaty. The Revised Statutes, after providing for the hearing before the justice, or other officer to whom that duty is committed, to the end that the evidence of criminality may be heard and considered, proceed to enact, that if, on such hearing, such officer "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention."

The subject of what proof shall be required for the delivery upon requisition of parties charged with crime is considered in article I of the treaty, in regard to which it is provided "that this shall be done only when the fact of the commission of the crime shall be so established as that the laws of the country in which the fugitive or the person so accused shall be found would justify his or her apprehension and commitment for trial if the crime had been there committed."

Taking this provision of the treaty, and that of the Revised

Statutes above recited, we are of opinion that the proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him. The language of the treaty which we have cited, above quoted, explicitly provides that "the commission of the crime shall be so established as that the laws of the country in which the fugitive or the person so accused shall be found would justify his or her apprehension and commitment for trial if the crime had been there committed." This describes the proceedings in these preliminary examinations as accurately as language can well do it. The act of Congress conferring jurisdiction upon the commissioner, or other examining officer, it may be noted in this connection, says that if he deems the evidence sufficient to sustain the charge under the provisions of the treaty he shall certify the same, together with a copy of all the testimony, and issue his warrant for the commitment of the person so charged.

We are not sitting in this court on the trial of the prisoner, with power to pronounce him guilty and punish him or declare him innocent and acquit him. We are now engaged simply in an inquiry as to whether, under the construction of the act of Congress and the treaty entered into between this country and Mexico, there was legal evidence before the commissioner to justify him in exercising his power to commit the person accused to custody to await the requisition of the Mexican government. Omitting much, therefore, that under this view of the case is immaterial, both in the argument of counsel and in the record of the case as it comes before us, the following facts appear to be well established :

Mr. Henry E. Abbey, a noted theatrical manager in this

country, had brought Adelina Patti, the wonderful songstress, from Europe to the United States under an arrangement that she would also sing in Mexico. Benson made the acquaintance of Abbey here, and also became intimate with his agent, whose name was Marcus Meyer. Through the latter he learned that arrangements had been made for the appearance of Patti at the Teatro Nacional in the City of Mexico, in the month of December, 1886. After obtaining the particulars of the engagement and contract for the use of that theatre from Abbey's agent, Benson hastened to the city of Mexico, where he represented himself as Meyer and as the agent of Mr. Abbey. He succeeded in imposing upon the parties having control of the theatre so far as to make them believe that he had full authority to conduct the arrangements for the concerts and operas in which Patti was to appear, which were advertised in the newspapers of that city. He accordingly proceeded to fix the date of such performances, to arrange the prices and issue the tickets therefor, which he sold and obtained the money for to the amount of some twenty-five or thirty thousand dollars. He escaped with this money, fled from Mexico, and went to Europe. Of course, all the persons who had bought the tickets, so issued by him, were defrauded of the amount paid for them, as well as great injury done to Mr. Abbey and the owners of the theatre in regard to the performances to be held there.

The specific offence charged against Benson arising out of this transaction is the forgery of these tickets of admission, of which the originals are produced before us with their translations.[1]

---

[1] The following are facsimiles of these tickets except as to color. The tickets for the stalls and balconies were blue, those for the galleries red, and those for the second and third tier of boxes yellow.

Opinion of the Court.

About the only contest made by the counsel for the prisoner is, that these are not forgeries, mainly because they are printed matter and are not in writing, and because neither the name of Mr. Abbey, nor of anybody purporting to be responsible therefor, is found in writing upon them, using the word "writing," as defendant's counsel does, as meaning script or signatures made by the use of a pen. It is therefore contended that these tickets are not forgeries, but the fraudulent intent with which they were issued, the actual loss and deception to the parties who bought them, and the injury to Mr. Abbey and the others concerned, are not controverted. It is said, however, that this is only a cheat at common law, and it is very strenuously argued that the real meaning of the

word "forgery" in this treaty is to be ascertained by the definition of that offence according to common law of England.

The first idea that occurs to the mind in reference to this suggestion is, that the common law of England can hardly be said to be the only criterion by which to construe the language of a treaty between Mexico and the United States. The former government cannot be supposed to have had that common law exclusively in mind as governing the true construction of a treaty concluded between itself and this country, neither of which owes any allegiance to England.

Another circumstance in connection with this matter is, that this court has frequently decided that there are no common-law crimes of the United States. In very few of the States were there common-law crimes remaining as subjects of punishment at the time when this treaty was made. Almost every State in the Union has recast her criminal law by the enactment of statutes in such a mode that the common law is now only appealed to as an aid in the definition of crimes. By the Roman civil law, which perhaps pervades or did pervade the jurisprudence of the larger portion of the civilized nations of the earth at the time of the making of this treaty, forgery was looked upon as one of the subdivisions of the *crimen falsi*, which included forgery, perjury, the alteration of the current coin, dealing with false weights and measures, etc. 1 Bouvier's Law Dictionary, 411. In support of this view it may be noted that the term corresponding to the word "forgery" which is used in the Spanish draft of the treaty is "la falsificacion."

It certainly does not appear from this that the Mexican authorities intended to be bound in the treaty by any very restricted use of the word "forgery" when the question concerned an offence of that character committed in Mexico. It is for an offence against Mexican law that the prisoner is held to answer. As he is not now upon final trial, but the only question is whether he has committed an offence for which, according to this treaty, he should be extradited to that country and there tried, we do not see that in this application to

set the prisoner at large, after he has been once committed by an examining court having competent authority, and after having been held to answer in Mexico for the offence charged; this court is bound to examine with very critical accuracy into the question as to whether or not the act committed by the prisoner is technically a forgery under the common law. Especially is this so when the wickedness of the act, the fraudulent intent with which it was committed and the final success by which the fraud was perpetrated, are undoubted.

But we are not satisfied that the crime of forgery, even at common law, is limited to the production by means of a pen of the resemblance of some man's genuine signature which was produced with a pen. This view of the subject would exclude from the definition of this crime all such instruments as government bonds, bank-notes, and other obligations of great value, as well as railroad tickets, where the signature of the officer which makes them binding and effectual is impressed upon them by means of a plate or other device representing his genuine signature. It would also exclude from its definition all such instruments charged as forgeries where the similitude of the signer's name is produced by a plate used by the forger. It can hardly be possible that these are not forgeries within the definition of the common law; and if they are, they show that it is not necessary that the name which appears upon the false instrument shall be placed thereon by means of a pen or by the actual writing of it in script, but that the crime may be committed as effectually if it is done by an engraved plate or type so arranged as to represent or forge the name as made by the actual use of a pen. It is difficult to perceive how the question as to whether the forgery was committed by printing, or by stamping, or with an engraved plate, or by writing with a pen, can change the nature of the crime charged.

Mr. Bishop, in the second volume of his work on criminal law, discusses the subject with his usual philosophical acumen. He says:

"Sec. 525. Looking at the writing as a representation addressed to the eye, reason teaches us that, whether it is made

with the pen, with a brush, with printers' type and ink, with any other instrument, or by any other device whatever — whether it is in characters which stand for words or in characters which stand for ideas, in the English language, or in any other language, — is quite immaterial, provided the representation conveys to any mind the substance of what the law requires to constitute the writing whereof forgery may be committed. This statement of the doctrine is in broader terms than are to be found in the books, yet there is no decision contrary to what is thus said; and, beyond doubt, the tribunals will hold the law as thus stated whenever the occasion requires.

"Sec. 526. Thus Mr. Hammond remarks: 'The question upon this branch of the inquiry remains, whether seals, or rather their impressions, with other similar subjects, are upon a similar footing with writings [here employing the word in its restricted sense]; and in all probability it will be found that they are, though no positive authority has sanctioned this notion.' "

This author also quotes from the fifth report of the English Criminal Law Commission, made in 1840, p. 69 *et seq.*, in which is found the following language, speaking of forgery :

"The offence extends to every writing used for the purpose of authentication; as in the case of a will, by which a testator signifies his intentions as to the disposition of his property, or of a certificate by which an officer or other authorized person assures others of the truth of any fact, or of a warrant by which a magistrate signifies his authority to arrest an offender. The crime is not confined to the falsification of mere writings; it plainly extends to seals, stamps, and all other visible marks of distinction by which the truth of any fact is authenticated, or the quality of genuineness of any article is warranted; and, consequently, where a party may be deceived and defrauded from having been, by false signs, induced to give credit where none was due."

While the views of counsel for the prisoner are unsupported by any well considered judicial decision, there is high authority for holding the contrary. The great increase in the use

of printing for all forms of instruments, such as deeds, bonds, tickets, tokens for the payment of goods, etc., have seemed to demand that where, either by the common law or by statute, such instruments are required to be in writing, the term "writing" should be held to include printing as well as script.

In *Henshaw* v. *Foster*, 9 Pick. 312, reference was made to the provision of the constitution of the State of Massachusetts which declared that "every member of the House of Representatives shall be chosen by written votes." A party offered his ballot, which was rejected, and he thereupon sued the inspectors of the election for their refusal to receive his vote. They declined to accept it upon the ground that the ballot was printed, and was not therefore "written" within the meaning of the constitution. The court, however, in a very well considered opinion, decided that the printed vote came within the meaning of the law requiring votes to be in writing.

In the subsequent case of *Commonwealth* v. *Ray*, 3 Gray, 441, the defendant was indicted for forgery, and the question was whether the instrument which he presented constituted a forgery at common law. The court said: "It is objected that the crime of forgery cannot be committed by counterfeiting an instrument wholly printed or engraved, and on which there is no written signature personally made by those to be bound. The question is whether the writing, the counterfeiting of which is forgery, may not be wholly made by means of printing or engraving, or must be written by the pen by the party who executes the contract. In the opinion of the court, such an instrument may be the subject of forgery, when the entire contract, including the signature of the party, has been printed or engraved. The cases of forgery generally are cases of forged handwriting. The course of business, and the necessities of greater facilities for dispatch, have introduced, to some extent, the practice of having contracts and other instruments wholly printed or engraved, even including the name of the party to be bound. . . . It has never been considered any objection to contracts required by the statute of frauds to be in writing that they were printed."

Then after speaking of the cases in which a signature made

by the pen is necessary to the execution of a contract, the court proceeds: "But if an individual or a corporation do in fact elect to put into circulation contracts or bonds in which the names of the contracting parties are printed or lithographed, as a substitute for being written with the pen, and so intended, the signatures are to all intents and purposes the same as if written. It may be more difficult to establish the fact of their signatures ; but if shown, the effect is the same. Such being the effect of such form of executing like contracts, it would seem to follow that any counterfeit of it, in the similitude of it, would be making a false writing purporting to be that of another, with the intent to defraud."

' It was, therefore, held in that case that, although he did not personally aid in the manual operation of engraving or lithographing the spurious instrument, yet it being conceded that it was done by his procuration, the defendant was responsible. That was the case of a railroad ticket, and the applicability of the decision to the matter now before us is unquestionable."

The case of *The People* v. *Rhoner*, 4 Parker's Crim. Rep. 166, is strikingly like the present one in almost every particular. There the prisoner had been committed by a justice of the peace on the preliminary examination, upon a charge of having in his possession, knowingly, counterfeited notes of the Austrian National Bank, with intent to defraud. He was brought before the Supreme Court in the State of New York by a writ of *habeas corpus*, and the same question which is raised here was there presented. It was said that every part of these bank-notes upon which the charge was founded, which appeared to be complete and entirely filled up, including the signature of the cashier or director, was evidently a print or impression from an engraved plate. The argument was there pressed, as in this case, that these notes could not be forgeries for that reason, nor could they be the subject of forgery. The whole question was very fully reviewed by Judge Sutherland in his opinion, in which he held that "the word 'instrument' includes not only 'written instruments' and 'writings,' but also engraved or printed instruments, being or purporting to

be the act of another; indeed, all and every kind of instrument by the forging of which any person may be affected, bound, or in any way injured in his person or property. I do not see why an engraved or printed instrument, or an engraved or printed name, affixed to an instrument by a person is not his act, and may not purport to be the act of another."

The same principle is reaffirmed by the Supreme Court of Massachusetts in the case of *Wheeler* v. *Lynde*, 1 Allen, 402.

We are of opinion that the decision of Commissioner Lyman, committing the prisoner to the custody of the marshal to await the requisition of the Mexican government, was justified, and the judgment of the Circuit Court dismissing the writ of *habeas corpus* is accordingly

*Affirmed.*