## IN THE MATTER OF THE APPLICATION OF RAFAEL MARTOREL FOR WRIT OF HABEAS CORPUS.

San Juan, Law, No. 1399.

RE EXTRADITION TO CUBA.

Extradition—Requisition.

    1. It is not necessary that a foreign requisition be filed with the secretary of state before extradition proceedings under Rev. Stat. § 5270. The commission may proceed without it.

## Re Martorel.

Extradition—Commissioner.

  2. If the commissioner has jurisdiction of the subject-matter and
the person, and the offense is within the treaty, the decision of the
commissioner upon legal evidence cannot be reviewed by the courts.

Cuba–Spanish Procedure.

  3. The Spanish procedure still obtains in Cuba, under which
hearsay is permissible, even in criminal cases. If such evidence
introduced from Cuba stood alone, it might be questionable whether
the commissioner could retain the prisoner.

American Extradition Treaty with Cuba—Falsification of Documents.

  4. The allegation of falsification of a public document implies a
previous existence of the document. Subornation of perjury to se-
cure a document is not falsification of a document.

Extradition—Other Offense.

  5. Where the case shows a violation of another clause of the
treaty and that the applicant in habeas corpus is an undesirable
alien, he may be held a reasonable time by the court to allow amend-
ment of the procedure.

Extradition—Limitations.

  6. It being unnecessary to pass upon the question of the Statute
of Limitations, it is not to be held as passed upon in any way.

Opinion filed July 29, 1920.

---

*Messrs. Miguel Guerra* and *Coll y Cuchi* for petitioner.

*Messrs. Muñoz & Brown* for Government of Cuba.

HAMILTON, Judge, delivered the following opinion:

On July 1, 1920, petition for habeas corpus was filed in this
cause, by Rafael Martorel, alleging that he was unlawfully
imprisoned by the marshal of the United States district court
in the penitentiary at San Juan under a warrant of arrest is-

Re Martorel.

sued by the United States Commissioner on complaint by the Consul of the Republic of Cuba under the Extradition Treaty of February 8, 1905. (33 Stat. at L. 2265.) The return of the marshal shows that the prisoner is held under a warrant by United States Commissioner Savage dated July 1, 1920, which in preamble sets out that the Chargé of the Cuban Consulate makes oath that said Martorel committed the crime of falsification of public documents by securing certain false evidence to be introduced in regard to the marriage and heirship of Manuel Fernando Fernandez Vega, deceased, upon which the Commissioner made the commitment in question. Proceedings were had in this court upon said petition for habeas corpus. The court permitted the petition to be amended on July 12 in order to make its allegations more specific, and the case was finally submitted on petition and motion to quash the petition July 13, 1920. The evidence introduced before the United States Commissioner was reintroduced upon the hearing of the petition and consists of proceedings before Cuban courts duly certified by the Cuban authorities and by the Consul and other authorities in the United States.

1. The treaty in question between the United States and Cuba is found in 33 Stat. at L. 2265, bearing date February 8, 1905. It is there provided in art. 3 that "the extradition of the fugitives under the provisions of this treaty shall be carried out . . . in conformity with the laws regulating extradition for the time being in force in the state in which the demand for the surrender is made," that is to say, the proceedings must conform to the Federal practice. That is governed by Revised Statutes, § 5270, Comp. Stat. § 10,110, 3 Fed. Stat. Anno. 2d ed. p. 265, which is as follows: "Whenever there is a treaty

or convention for extradition between the government of the United States and any foreign government, any Justice of the Supreme Court, circuit judge, district judge, commissioner, authorized so to do by any of the courts of the United States, or judge of a court of record of general jurisdiction of any state, may, upon complaint made under oath, charging any person found within the limits of any state, district, or territory, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

Whether this requires that extradition papers shall first have been filed with the Secretary of State has been an open question. Re Farez, 7 Blatchf. 34, 345, 491, Fed. Cas. Nos. 4,644, 4,646. It was decided that the requisition must first have been made before the Commissioner could act. Re Herris, 32 Fed. 583. It was, however, held by Mr. Justice Brewer, on appeal, that this might often result in the defeat of justice, and the ruling was reversed [33 Fed. 165]. Mr. Justice Nelson, how-

ever, thought otherwise, and his opinion was followed in the
second circuit.  Re Farez, 7 Blatchf. 491, Fed. Cas. No. 4,646.
The point was finally set at rest by the opinion of the Supreme
Court in the case of Grin v. Shine, in 1902, 187 U. S. 181, 47
L. ed. 130, 23 Sup. Ct. Rep. 98, 12 Am. Crim. Rep. 366.   The
result is that under Rev. Stat. § 5270, when complaint is
made under oath charging a person in the district with hav-
ing committed a crime provided for by the treaty a Commis-
sioner or a district judge may issue his warrant and hear the
evidence of criminality.  If upon the hearing he deems the evi-
dence sufficient to meet the treaty he shall certify the same with
the testimony to the Secretary of State that a warrant may issue
upon the requisition of the proper authorities of such foreign
government, meantime committing the person so charged to
jail.   It was under this law that Commissioner in this case
heard the complaint of the Cuban Consul and committed the
petitioner herein to jail.   The case was not certified to the
Secretary of State because of the interposition of the petitioner
for habeas corpus, but the papers are all ready for such trans-
mission to the Secretary of State.

2. A preliminary question in every proceeding is as to the
jurisdiction of the court to which application is made, that is
to say, in the case at bar, the jurisdiction of the United States
district court.  A writ of habeas corpus in a case of extradition
cannot perform the office of a writ of error.  If a Commissioner
has jurisdiction of the subject-matter and the person, if the
offense charged is within the treaty and the commissioner who
committed has competent legal evidence, his decision cannot be
reviewed by other courts.  Re Oteiza y Cortes, 136 U. S. 330,
34 L. ed. 464, 10 Sup. Ct. Rep. 1031, 8 Am. Crim. Rep. 241;

Benson v. McMahon, 127 U. S. 457, 32 L. ed. 234, 8 Sup. Ct. Rep. 1240. The evidence before the Commissioner need not be conclusive and need not be direct provided there is evidence leading to the conclusion adopted by the Commissioner. Ex parte Zentner, 188 Fed. 344; Re Breen, 73 Fed. 458. It is not necessary that the evidence before the Commissioner shall be sufficient to sustain a conviction. Ex parte Glucksman, 189 Fed. 1016. It would seem, therefore, that the jurisdiction of this court upon a petition for habeas corpus in an extradition proceeding before a Commissioner is limited to inquiring (a) whether the crime as alleged is comprehended within the treaty, and (b) whether the evidence as adduced is such as "according to the laws of the place where the fugitive or person so charged shall be found would justify his or her apprehending a commitment for trial if the crime or offense had been there committed." It will be convenient to consider these two questions in the reverse order.

3. Porto Rico, no less than Cuba, was Spanish, until the Spanish-American war of 1898, inheriting the same traditions and customs from the time of Columbus. After the Treaty of Paris of 1900 Porto Rico became a part of the United States and subject to American influences, her laws being modified in accordance with Anglo-American ideals. Porto Rico is now under a Criminal Code, Code of Criminal Procedure, and law of evidence, based upon American models, the essence of which is a public trial, in which the defendant is confronted with witnesses against him, allowed counsel, and the evidence adduced must be primary and not hearsay. Cuba on the other hand has retained with slight modifications the Spanish procedure in which trials are not always public nor counsel always al-

Re Martorel.

lowed, and evidence taken by deposition not necessarily in the presence of the defendant, and consisting of whatever the officials think tends to prove the case. Thus hearsay is admissible there. The difference of systems grows out of the difference of civilizations, the Anglo-American taking its rise from the Germanic influences, in which the individuality of the citizen was emphasized, while under the civil law of the continental states the emphasis was upon the power of the state under the theory that the state would protect the individual. This is not the place for consideration of a discussion of the two systems. An American naturally thinks that his own is preferable and it has been a matter of interest to hear Porto Ricans, who but for the War would have been under the Spanish system, advocating forcibly and as an American must think correctly the advantages of the present system in Porto Rico. It is to be remembered, however, that the petitioner is a Cuban and so if surrendered would be returning to laws under which he has grown up and which he no doubt prefers. Art. 5 of the treaty provides that "neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this treaty." This has no application therefore to the facts of this case.

The particular feature of the case which is relied upon by the petitioner as showing that the evidence would not justify trial in Porto Rico is that the record contains "a duly authenticated copy of the warrant of arrest in the country where the crime or offense has been committed, and of the depositions or other evidence upon which such warrant was issued, . . . all facts and data necessary to establish the identity of the person whose extradition is sought shall also be presented."

Re Martorel.

Treaty, art. 3. In this regard the record contains a great deal of hearsay evidence, and possibly the most interesting part of the record is the report of the police authorities, based upon investigations made by their agents, secretly and in all quarters, regarding the life of the petitioner. This paper would have to be excluded because not evidence of anything under the American system any more than the pleadings in a case are evidence. If it stood alone there would be no question that sufficient evidence had not been produced to justify the extradition of the petitioner.

But it does not stand alone, for there is the testimony of the commanding officer of the deceased Fernandez and of others who knew him, and direct evidence also of parties who knew the petitioner in Cuba. In the United States common repute is sometimes admissible as to marriage. Without taking the evidence up in detail, it suffices to say that it seems to the court that there was enough evidence before the Commissioner to justify the provisional retention of the petitioner under the treaty.

4. The more important point, perhaps, is as to whether the crime charged is embraced within the terms or spirit of the treaty. The ground of application by the Consul for the Republic of Cuba is that petitioner in the year 1917 committed the "crime of falsification of public documents," while the treaty mentions "(4) forgery, or the utterance of forged papers, or falsification of the official acts or documents of the government or public authority, including courts of justice, or the utterance or fraudulent use of any of the same." There is also further down in the treaty mentioned "(8) perjury; subornation of perjury." 33 Stat. at L. 2265. Argument is made

that the offense shown by the evidence to have been committed
is not the falsification of a document, but the procuring of false
evidence so that proceedings perfectly correct in form but mis-
taken in fact were had before a Cuban court and official entries
made accordingly.   Whether there was proper evidence or not
has been considered; but the general trend of the evidence in-
troduced for the Republic of Cuba tends to show that Manuel
Fernando Fernandez Vega was a native of Porto Rico, being
born at Ciales in 1876 and was in business in. San Juan for
some time.   That in January, 1896, he went to New York and
became a member of an expedition commanded by General Rus
of the Cuban army, which landed at Maniti, Cuba, May of the
same year, and the troops of which the said Fernandez was a
member operated about Havana.   That in December, 1896, he
was private secretary to Domingo Hernandez, a commandant
in the regiment of Calixto Garcia and that the said Fernandez
was killed with others in a skirmish in the municipal district
——— of San Antonio de los Baños.   The impression of his
commander and others was that he died unmarried.   In 1915
record was made at ——— to this effect.   In 1917, how-
ever, Rafael Martorel, also a native of Porto Rico, who had
been owner of cafés in Havana but prior to that had lived at
Batabano, secured a woman to appear before the municipal
court at Batabano and the municipal court of Regla and with
witnesses proved to the satisfaction of those courts that she was
the widow of said Fernandez, and that her boy was his legiti-
mate son.   That shortly afterwards the alleged widow and son
made a deed to said Martorel, under which he returned to Porto
Rico and instituted proceedings at Arecibo for the recovery of

Re Martorel.

an estate of $32,000 value which had been left to said Fernandez by his deceased father.

The argument is that if this was an offense at all it was of perjury and not falsification of documents and that accordingly Martorel is not accused of any crime which the evidence shows he committed. The treaty provides that there shall be no surrender for political offenses and that "no person surrendered by either of the contracting parties to the other shall, without his consent, freely granted and publicly declared by him, be triable or tried or be punished for any crime or offense committed prior to his extradition, other than that for which he was delivered up." Art. 8. "Falsification of the official acts or documents of the government or public authorities, including courts of justice," together with forgery or utterance of forged papers make up subdivision 4 of art. 2 of the treaty. In the United States Revised Statutes falsification of documents is also prohibited in § 5394, Comp. Stat. § 10,297, which is as follows: "Every person who feloniously steals, takes away, alters, falsifies, or otherwise avoids any record, writ, process, or other proceeding, in any court of the United States, by means whereof any judgment is reversed, made void, or does not take effect, and every person who acknowledges, or procures to be acknowledged, in any such court, any recognizance, bail, or judgment, in the name of any other person not privy or consenting to the same, shall be fined not more than five thousand dollars or be imprisoned at hard labor not more than seven years; . . ."

It is clear that this wording presupposes the existence of the record falsified. It does not extend to procuring another to commit perjury in the case; that is a separate offense provided for in the section immediately preceding where it is said that

"every person who procures another to commit any perjury is guilty of subornation of perjury, and punishable, etc." Perjury is defined in Revised Statutes, § 5392, as being a false statement by a witness under oath. The P. R. Penal Code, § 413 is not dissimilar. On the other hand, in Spanish falsedad has been since the Partidas the changing of the truth, imitation, alteration, suppression, and the like. Falsificación is the act of adulteration or changing of anything, like a writing. Every falsification, says Escriche, is falsedad, but not every falsedad is falsificación. Falsedad is where a witness gives false testimony or is silent when he ought to speak, but there is no falsificación except when there is some fiction or real alteration of a material thing, such as a signature, seal, will, or writing. Escriche, s. v. Falsedad, Falsificación.

It would seem to follow, therefore, that the evidence introduced in this case does not prove falsification of documents.

5. This being so, what is the proper procedure? The treaty was made because the countries were "desirous to confirm their friendly relations and to co-operate to promote the cause of justice," and to that end to deliver up persons for trial therefor. The evidence tends to show that the petitioner is guilty of the charge of subornation of perjury, and if so is an undesirable alien who upon proper proceedings is subject to extradition. If a requisition had been filed making the wrong charge it might well be that the Cuban authorities had elected and no duty or comity was incumbent upon the Federal authorities in the premises. It may be that in the case at bar the Cuban authorities would rather see the petitioner released than change the application which they have made for his arrest. This court is far from indicating what they should or should

Re Martorel.

not do; but it would seem that the proper course is not to turn loose a prisoner whose acts contravene the treaty until the Cuban authorities have the opportunity to consider what they wish done in the premises. It is conceivable, however it might be in the case at bar, that if released such a person might escape before a new application can be made to arrest him.

Upon the whole, the best course would seem to be to file this opinion without deciding the case for three days. At the end of that time if there is no change in the proceeding the court will render a final order upon the application for habeas corpus.

6. In this view of the case it would seem unnecessary to take up the question of Statute of Limitations, and that, therefore, is not passed upon one way or the other.

It is therefore ordered that this opinion be filed without more.