THE STATE EX REL. ROGERS *v.* TAFT, SECY. OF STATE, ET AL.

[Cite as *State ex rel. Rogers v. Taft* (1992), 64 Ohio St.3d 193.]

(No. 92–972—Submitted and decided June 2, 1992—
Opinion announced June 19, 1992.)

*Bricker & Eckler* and *Percy Squire,* for relator.

*Lee I. Fisher,* Attorney General, and *Cherry Lynne Poteet,* for respondent Bob Taft.

*James A. Philomena,* Prosecuting Attorney, and *Sharon K. Hackett,* for respondent Mahoning County Board of Elections.

---

*Per Curiam.* We reject each of relator's claims for relief, overrule her motion for summary judgment, and deny the writ.

Relator's first claim for relief is based on the recent history of federal litigation involving Ohio's apportionment plans. In 1988, African–American plaintiffs challenged the house district boundary created in Mahoning County under the 1981 state apportionment plan in the United States District Court for the Northern District of Ohio, Eastern Division. On September 4, 1991, the court held that the boundary violated the Fifteenth Amendment to the United States Constitution and the federal Voting Rights Act of 1965. *Armour v. Ohio* (N.D.Ohio 1991), 775 F.Supp. 1044. The court declined to order the state to adopt the plaintiffs' proposed districts because the 1991 apportionment plan was to be published by October 5, 1991; however, the court retained jurisdiction to consider further relief if necessary. That plan ("the 1991 plan") was published, but on January 31, 1992, the same United States District Court held that the plan violated the Voting Rights Act of 1965 in *Quilter v. Voinovich,* 794 F.Supp. 695. The court in *Quilter* later held a subsequent revision of the 1991 plan, the "1992 plan," unconstitutional on March 10, 1992, 794 F.Supp. 756, and the court then ordered the primary election for the General Assembly delayed until September 8, 1992, and appointed a special master to prepare an acceptable apportionment plan. However, the court's decision in *Quilter* was appealed, and the United States Supreme Court stayed the orders delaying the primary and appointing the special master. *Voinovich v. Quilter* (1992), 504 U.S. ——, 112 S.Ct. 1663, 118 L.Ed.2d 382. The court later noted probable jurisdiction. *Voinovich v. Quilter* (1992), 504 U.S. ——, 112 S.Ct. 2299, 119 L.Ed.2d 223.

On April 21, 1992, the plaintiffs in *Armour* moved to have the court (1) establish districts in Mahoning County that would maximize African–American voting strengths in elections that would otherwise be at large, (2) order this localized plan published and the voters informed of the districts' configuration, and (3) establish filing qualification dates for candidates.

On April 23, 1992, the court denied this motion in *Armour,* indicating that the 1991 plan, to which a February 20, 1992 filing date applied, would be the vehicle for conducting the primary election. *Armour v. Ohio* (Apr. 23, 1992), N.D.Ohio No. C88–1104Y, unreported. The *Armour* plaintiffs then moved the *Armour* court to stay and reconsider its April 23 order because "[p]otential candidates for nomination did not file petitions under the 1991 Plan in advance

of the February 20, 1992 deadline, for the reason [that] they relied on the invalidation of that Plan on January 31, 1992." The *Armour* plaintiffs also requested a show-cause order why the state should not be held in contempt under the April 23 order, as the state was proceeding under the 1992 plan instead of the 1991 plan, as stated in that order.

Before the court acted on the foregoing motion in *Armour*, however, it issued an order in *Quilter* on May 5, 1992, 794 F.Supp. 760, (1) declaring the 1992 plan to be the vehicle for conducting the primary election, (2) setting May 8, 1992 as the filing deadline for districts that were changed as the 1991 plan became the 1992 plan (not including Mahoning County districts), and (3) reserving to the *Armour* case further action on the *Armour* plaintiffs' motion for stay, reconsideration, and to show cause, as follows:

"Additionally, the plaintiffs in *Armour v. Ohio* filed a motion asking, *inter alia*, for the issuance of an order to show cause why the State of Ohio should not be held in contempt of court because use of the 1992 Plan was in conflict with the April 23rd order of the *Armour* court requiring the election to take place under the 1991 Plan. We decline however, to take cognizance of the entire motion, including the request for a show cause order, because the motion was filed in *Armour v. Ohio*. Because we hold that the election may proceed under the 1992 Plan, the *Armour* plaintiffs' other requested relief can be resolved by the *Armour* court at a later date."

The Sixty–Fourth House District was not changed by the 1992 plan. Accordingly, the extension of the filing deadline to May 8, 1992 did not affect relator. However, in her first claim for relief, she argues that respondents have a duty to make the same extension for her because the court in *Quilter* reserved that issue for decision in *Armour*. On the contrary, we do not find that the actions of the federal court create any duty in respondents. Absent a federal court order to change the filing deadline, it remained February 20, 1992. No such order was given. That the federal court reserved the right to make such an order in other pending litigation is not the equivalent of actually making that order. Moreover, as the decision on whether to make such an order is to be made in the *Armour* case, in which relator is a member of the plaintiffs' class, she has an adequate remedy at law in that previously filed action. See *State ex rel. Citizens for Fair Taxation v. Lucas Cty. Bd. of Commrs.* (1992), 63 Ohio St.3d 749, 591 N.E.2d 691.

Similarly, we find no merit in relator's third claim for relief. She claims that respondent Taft's adoption of the position that majority-minority districts must be created wherever possible estops him from denying it in this case, and that R.C. 3501.05(C) and (M) then compel him to instruct the respondent-board to construct, prior to the primary election, such districts in Mahoning

County for elections that would otherwise be at large. R.C. 3501.05(C) requires the Secretary of State to "[p]repare rules and instructions for the conduct of elections"; R.C. 3501.05(M) requires him to "[c]ompel the observance by election officers in the several counties of the requirements of the election laws[.]" We find nothing in these statutes requiring the board to act as an apportionment agent, whatever the Secretary of State's views may be, or may have been, on majority-minority districts. Nor has relator adduced any evidence that the state has violated the Fifteenth Amendment to the United States Constitution or the Voting Rights Act of 1965 by providing for election of judges, county commissioners, and others at large instead of from separate districts.

Relator's second claim for relief, to require the board to count certain signatures it rejected on relator's petitions, is equally meritless. The claim is in three parts. First, relator argues that one invalidated "signature" should be restored even though it was not a signature, but was printed. She cites *George A. Ohl & Co. v. A.L. Smith Iron Works* (1933), 288 U.S. 170, 53 S.Ct. 340, 77 L.Ed. 681, and *Benson v. McMahon* (1888), 127 U.S. 457, 8 S.Ct. 1240, 32 L.Ed. 234. In *Ohl,* the United States Supreme Court held that a judge's initials on a bill of exceptions, where the statute required a signature, would be sufficient because " * * * the District Judge authenticated his allowance of the bills of exceptions by a form of signature easily and actually identified as his. No one was misled or injured. We perceive no reason why petitioner should lose its right to have the rulings upon the trial reviewed by the appellate court, merely because the District Judge failed to sign his full name." *Id.,* 288 U.S. at 177, 53 S.Ct. at 342, 77 L.Ed. at 684–685.

Moreover, the *Ohl* court also stated that "[t]he statute contains no indication that the word 'sign' is used in other than the ordinary sense. The statute gives neither definition nor qualification." *Id.* at 176, 53 S.Ct. at 342, 77 L.Ed. at 684.

In *Benson,* a habeas corpus petitioner contended that he could not be charged with forgery because the alleged act of forgery did not involve a signature, but the printing of a name on concert tickets. The court held that the crime of forgery included falsification by printing.

We do not find *Ohl* or *Benson* persuasive in the present context. First, we examine this issue to determine whether the board has been guilty of fraud, corruption, abuse of discretion, or clear disregard of statutes or other legal provisions. *State ex rel. Beck v. Casey* (1990), 51 Ohio St.3d 79, 554 N.E.2d 1284. Under R.C. 3501.11(K), boards of elections are required to verify petitions. One way of doing this is to check the signature on the petition against the signature required by R.C. 3503.15 on the registration forms on file at the board of elections. Concerning signatures on petitions, R.C. 3501.38(B) states:

"Signatures shall be affixed in ink. Each signer may also print his name, so as to clearly identify his signature."

Thus, the General Assembly obviously did not mean to include printing within the term "signature" as used in the statute, since the relevant law clearly distinguishes the two. This is an important distinction from the statute in *Ohl.*

Second, in *State ex rel. Green v. Casey* (1990), 51 Ohio St.3d 83, 85, 554 N.E.2d 1288, 1290, we stated that R.C. 3501.38 implicitly requires a cursive signature. In effect, relator asks us to reconsider that decision. We decline to do so on this evidence. Accordingly, we find no fraud, corruption, abuse of discretion or clear disregard of law by the board on this issue.

In the second part of her second claim for relief, relator argues that another rejected signature should be reinstated. The board rejected the signature because the name was signed "Loretta Sheldon" on the petition and "Loretta Floyd–Sheldon" on the registration. Relator contends that Sheldon is, in fact, the voter registered as Floyd–Sheldon.

The board invalidated the signature "since it has no way of knowing whether Loretta Sheldon and Loretta Floyd–Sheldon are the same person." Relator's affidavit stating that "Mary Sheldon [*sic*]" said she is the same person registered as "Mary Floyd–Sheldon [*sic*]" is not only inadmissible hearsay, it is not relevant to the issue of *Loretta* Sheldon's identity. Thus, we hold that the board did not abuse its discretion or otherwise err by refusing to accept the signature of Loretta Sheldon as that of Loretta Floyd–Sheldon. Even if the addresses on the petition and registration form were the same, there was no proof that the signer and the registered voter were the same person rather than different persons living at the same address.

In the third part of her second claim for relief, relator argues that the signatures of five of her petition signers should be reinstated even though they listed an address on the petition different from the address on file at the board of elections. She admits that precedent is against her on this issue. See *In re Protest Filed by Citizens for the Merit Selection of Judges, Inc.* (1990), 49 Ohio St.3d 102, 551 N.E.2d 150, paragraph three of the syllabus. However, she states that since *In re Protest*, the General Assembly has liberalized voting requirements under R.C. 3503.11 by allowing registered electors in certain cases to notify the board of elections on election day of an address change. See 143 Ohio Laws, Part II, 3658, 3661. She cites this change in the election laws as evidence of a new spirit of liberality that should reverse the result in *In re Protest* and allow persons to sign nominating petitions with their present address, since they may correct the registration address on election day. However, while liberalizing registration under R.C. 3503.11, the General Assembly left intact R.C. 3501.38(C), which states:

"Each signer shall place on the petition after his name the date of signing and the location of his voting residence, including the street and number if in a municipal corporation or the rural route number, post office address, or township if outside a municipal corporation. *The voting address given on the petition shall be the address appearing in the registration records at the board of elections.*" (Emphasis added.)

The General Assembly having failed to amend this pointed and relevant section, we conclude that it did not wish to extend the spirit of liberality to the signing of petitions. Accordingly, we find no fraud, corruption, abuse of discretion, or clear disregard of law in the board's rejection of these signatures.

"In order to grant a writ of mandamus, a court must find that the relator has a clear legal right to the relief prayed for, that the respondent is under a clear legal duty to perform the requested act, and that relator has no plain and adequate remedy at law." *State ex rel. Westchester Estates, Inc. v. Bacon* (1980), 61 Ohio St.2d 42, 15 O.O.3d 53, 399 N.E.2d 81, paragraph one of the syllabus. Relator having failed to establish all three of these elements in any of her claims for relief, we hereby deny the writ.

*Writ denied.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.