CALLAHAN, Circuit Judge,
with whom IKUTA, Circuit Judge, joins, dissenting:
The question in this habeas case is straight-forward: Under the federal extradition statute, 18 U.S.C. §§ 3181-3195, and the terms of the extradition treaty between the United States (“Government”) and Mexico, did the extradition judge err in excluding evidence that contradicts the Mexican government’s evidence of probable cause to believe that Jose Luis Munoz Santos (“petitioner”), a fugitive of Mexico, is guilty of kidnapping in Mexico? The majority answers with a resounding “yes,” overturning more than a century’s worth of extradition jurisprudence. It first re *1036 Views the extradition court’s decision for technical error, exceeding the scope of judicial review under well-established Supreme Court precedent. Second, despite its protestations to the contrary, the majority risks converting a probable cause hearing into a mini-trial with all the evidentiary trappings, again contrary to Supreme Court precedent. Moreover, by requiring extradition judges to consider and weigh evidence that a fugitive raises in defense of the criminal charge he faces abroad, the reliability of the foreign nation’s evidence is put to the test on American sod. Under the governing treaty, however, and consistent with controlling precedent, this assessment is reserved for the Mexican judicial authorities, not U.S. courts.
Extradition judges are not judicial Transformers; they are not trial judges in ¡.disguise. Congress, has never deputized extradition judges for this purpose, nor has it vested Article III judges with the power to expand the limited role these judicial officers serve in the realm of foreign relations. The majority’s approach violates the terms of the governing treaty and the statutory framework established by Congress. The approach also interferes with the diplomatic relationship that the Executive and Legislative branches have established with Mexico. Because the Judiciary is not authorized to drive a wedge in that relationship, I dissent.
I. Background
Mexican authorities have charged the petitioner with kidnapping Dignora Hermosillo Garcia (“Hermosillo”) and her four- and six-year-old daughters for ransom in August 2005.[1] Kidnapping is an extraditable offense under the extradition treaty between the United States and Mexico. Extradition Treaty Between the United States of America and the United Mexican States, Mex.-U.S., May 4, 1978, 31 U.S.T. 5059 [hereinafter “Extradition Treaty” or “Treaty”].[2] On August 15, 2006, Mexico requested the petitioner’s extradition by formal request, and a United States Magistrate Judge of the Central District of California held a hearing to determine his extraditability. On behalf of Mexico, the United States submitted witness statements from the victims and confessions from the petitioner’s co-conspirators:
(1) Hermosillo described the kidnapping and identified Fausto Librado Rosas Al-faro (“Rosas”) as the armed, masked man who abducted her and her daughters from their home and tied them up (August 29, 2005 and November 7, 2005);
(2) Roberto Castellanos Meza (“Castella-nos”), Hermosillo’s husband and the father of the abducted children, described events that transpired before and after the kidnapping (August 21, 2005);
(3) Benigno Andrade Hernandez (“An-drade”) voluntarily appeared before a prosecutor and incriminated himself, Munoz and Rosas in a sworn statement, and identified both in photographs (January 12, 2006);
(4) Jesus Servando Hurtado Osuna (“Hurtado”), a co-conspirator, received assistance from a public defender and incriminated himself, Munoz, Rosas and two other individuals, admitting their involvement both in planning and executing the kidnapping (March 14, 2006); and
(5) Rosas, a co-conspirator, appeared before a criminal court judge and implicat *1037 ed himself, Hurtado and Munoz, and corroborated Hurtado’s version of events (signed March 27, 2006).
In re Extradition of Santos, 795 F.Supp.2d 966, 972-79 (C.D.Cal.2011).
The statements were made to Mexican law enforcement or to the Mexican judiciary and properly authenticated, a fact the petitioner does not contest. Specifically,
[t]hat evidence was contained in various filings accompanied by certificates with ribbons and seals signed by the then-current principal consular officer, the “Minister Counselor of Consular Affairs” of the United States at Mexico City, Mexico, attesting that the annexed documents were “properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of the United Mexican States.”
Id. at 971 (record citations omitted).
Based on the Government’s presentation, the extradition judge found probable cause to believe that the petitioner was guilty of the alleged kidnapping and, accordingly, certified his extradition. In reaching this conclusion, the judge excluded statements from the co-conspirators recanting their prior confessions, which they alleged were obtained through torture.[3] The Mexican government disputed these allegations with an affidavit from a Mexican prosecutor attesting to Hurtado’s and Rosas’s detention in Mexico, the failure of either conspirator to file a formal complaint with Mexican authorities that they had been tortured, and the results of medical and psychological examinations conducted of both individuals on March 21-22, 2006, which revealed no evidence of bodily injury or mental disorder.[4]
II. Standard of Review
“[A] habeas petition is the only available avenue to challenge an extradition order,” and the scope of review is severely limited. Vo v. Benov, 447 F.3d 1235, 1240 (9th Cir.2006); see 28 U.S.C. § 2241. An error in declining to consider evidence at an extradition hearing is not a basis for habeas relief. Long ago Justice Brandéis, speaking on behalf of a unanimous Supreme Court, made it abundantly clear that the “mere wrongful exclusion of specific pieces of evidence, however important, does not *1038 render [an extradition] detention illegal.” Collins v. Loisel, 259 U.S. 309, 316, 42 S.Ct. 469, 66 L.Ed. 956 (1922); see Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925) (Holmes, J.); Collins v. Miller, 252 U.S. 364, 369, 40 S.Ct. 347, 64 L.Ed. 616 (1920) (Brandeis, J.); Charlton v. Kelly, 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913). When the magistrate in Charlton excluded the fugitive’s “impressive evidence of insanity,” for example, the Supreme Court rejected the fugitive’s claim of reversible error because the alleged error was beyond the scope of habeas relief. 229 U.S. at 457-58, 461-62, 33 S.Ct. 945.
The Supreme Court has not created any exception to this rule. Habeas review is limited to “[1] whether the magistrate had jurisdiction, [2] whether the offense charged is within the treaty and, [3] by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.” Fernandez, 268 U.S. at 312, 45 S.Ct. 541 (emphasis added). The third factor — the only factor at issue here — requires the court to determine “whether, under the construction of the act of [CJongress and the treaty entered into between this country and Mexico, there was legal evidence before the [extradition judge] to justify him in exercising his power to commit the person accused to custody to await the requisition of the Mexican government.”[5] Benson v. McMahon, 127 U.S. 457, 463, 8 S.Ct. 1240, 32 L.Ed. 234 (1888) (emphasis added).
This express limitation reflects the principle that the existence of foreign criminal proceedings, which we must accept as adequate for purposes of extradition, will give the fugitive ample process to develop his claims of innocence. See Fernandez, 268 U.S. at 312, 45 S.Ct. 541; Glucksman v. Henkel, 221 U.S. 508, 512, 31 S.Ct. 704, 55 L.Ed. 830 (1911) (Holmes, J.). Unlike a habeas petition from a criminal conviction, a habeas petition in the extradition context is not the end of the line; rather, it is only a preliminary step designed to allow the criminal process to continue and be completed in the country with jurisdiction over the charged crime.
The majority, in essence, disregards this longstanding precedent. Although it acknowledges that a judge sitting as an extradition court must “consider whether the evidence is ‘sufficient to sustain the charge under the provisions of the proper treaty or convention,’ ” Maj. Op. 1000 (quoting 18 U.S.C. § 3184), this acknowledgment is just a token reference to 18 U.S.C. § 3184. That’s the last time either the Treaty or the statute appears in the opinion. The majority’s approach departs from the example set by the Supreme Court confining its review of an extradition order to strict applications of the extradition statute and the relevant treaty. In setting its preferred standard of review, the majority loses sight of the paramount inquiry of any extradition application: whether probable cause exists to believe that the fugitive committed the crimes charged in the requesting country. The majority’s approach allows it to make determinations reserved for the Mexican legal system. This is a clear violation of principles of international comity and separation of powers.
III. Extradition Framework
Courts play a narrowly defined role in the extradition process. The process begins with the decision of the political branches to enter into an extradition treaty, a decision that rests on those branches’ determination that the foreign country’s legal and penal system is one into which *1039 the United States is willing to extradite fugitives. By statute, courts play an important role in determining whether an individual is eligible to be extradited under the terms of the applicable treaty, but that role is limited, as courts have long recognized.
For example, an extradition judge may not deny extradition on the ground that the requesting country will not provide a fugitive the procedures and rights available in an American criminal court, even if those rights are guaranteed under our Federal Constitution. Neely v. Henkel, 180 U.S. 109, 122-23, 21 S.Ct. 302, 45 L.Ed. 448 (1901). Nor may a judge entertain challenges that a requesting country has not followed its own laws in bringing a criminal case or extradition request. See Skaftouros v. United States, 667 F.3d 144, 155-56 (2d Cir.2011) (principles of international comity and judicial modesty restrain extradition courts from deciding most questions of foreign law and procedure). Unanimously, in Munaf v. Green, the Supreme Court even refused to review claims that a fugitive would be subject to torture or other inhumane treatment if surrendered. 553 U.S. 674, 700-02, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (Roberts, C.J.); see Trinidad y Garcia v. Thomas, 683 F.3d 952, 978 (9th Cir.2012) (“[C]ourts in this country refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely.”).[6]
To the extent that the alleged denial of constitutional rights should affect the willingness of the United States to extradite, the Supreme Court has held that “it is for the political branches, not the Judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments.” Munaf, 553 U.S. at 700-01, 128 S.Ct. 2207. In particular, the Court has emphasized:
The Judiciary is not suited to second-guess such determinations — determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government’s ability to speak with one voice in this area. See The Federalist No. 42, p. 279 (J. Cooke ed. 1961) (J. Madison) (“If we are to be one nation in any respect, it clearly ought to be in respect to other nationsf.]”). In contrast, the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is.
Id. at 702, 128 S.Ct. 2207; see Jhirad v. Ferrandina, 536 F.2d 478, 484-85 (2d Cir.1976) (“It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity upon which extradition is based.” (citing Factor v. Laubenheimer, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933))). In effect, U.S. courts “are bound by the existence of an extradition treaty to assume that the [foreign] trial will be fair.” Glucksman, 221 U.S. at 512, 31 S.Ct. 704. *1040 Here, the Treaty requires us to accept that Mexico’s judiciary will fairly evaluate the proffered evidence of torture should the petitioner choose to raise such evidence in defense of the kidnapping charge he faces there.
Because the political branches have plenary authority to accept the fairness of a foreign country’s legal system, it makes sense that the final decision to extradite rests with them. As defined by Congress, the Executive remains primarily responsible for extradition while the extradition judge is assigned the limited duty of determining the sufficiency of the request under the applicable treaty provisions. 18 U.S.C. § 3184; see Martin v. Warden, 993 F.2d 824, 828-29 (11th Cir.1993); Lopez-Smith v. Hood, 121 F.3d 1322, 1326 (9th Cir.1997) (“Extradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that [a] statute interposes a judicial function.”). That judicial function is carried out by conducting a hearing pursuant to § 3184 and, if the request is supported by sufficient evidence, certifying the foreign country’s request to the Secretary of State. The Secretary of State is not required to grant extradition but may, in his or her discretion, decline extradition for reasons that are not available to the courts or grant extradition subject to conditions. See 18 U.S.C. §§ 3184, 3186. This division of responsibility between the courts and the Executive branch reflects “institutional competence rationales and our constitutional structure, which places primary responsibility for foreign affairs in the executive branch.” United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.1997).
IV. The Extradition Hearing
The extradition process reflects these fundamental differences in institutional competence and separation of powers principles. In Benson, the Supreme Court stated that an extradition hearing is a limited affair akin to a preliminary hearing to determine whether to hold an accused to answer for the commission of a crime. 127 U.S. at 463, 8 S.Ct. 1240. “That explanation ... is no less persuasive today.” Ward v. Rutherford, 921 F.2d 286, 288 (D.C.Cir.1990) (Ginsburg, J.) (discussing Benson and citing Hooker v. Klein, 573 F.2d 1360, 1367 (9th Cir.1978), cert. denied, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978)). The Supreme Court has also likened an extradition proceeding to a grand jury investigation, where the procedural rights of the accused are limited. See Bingham v. Bradley, 241 U.S. 511, 517, 36 S.Ct. 634, 60 L.Ed. 1136 (1916) (no right to cross-examine government affiants at extradition hearings); Charlton, 229 U.S. at 459-62, 33 S.Ct. 945 (analogizing extradition proceedings to grand jury proceedings). We embraced this understanding in Barapind v. Enomoto when we held that an extraditee has no right to introduce contradictory or impeaching evidence. 400 F.3d 744, 750 (9th Cir.2005) (en banc). Because an extradition hearing is not a plenary trial at which guilt or innocence is decided, the Supreme Court has derided attempts to import trial-type procedural requirements into the proceeding. Fernandez, 268 U.S. at 312, 45 S.Ct. 541; Glucksman, 221 U.S. at 512, 31 S.Ct. 704 (“It is common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law. But it is a waste of time.”).
A. Role of the Extradition Judge
We have previously stated that extradition judges “conduct a circumscribed inquiry in extradition cases.” Blaxland v. Commonwealth Dir. of Pub. Prosecutions, 323 F.3d 1198, 1208 (9th Cir.2003). Their role is defined by statute as well as by the relevant extradition treaty. 18 U.S.C. §§ 3181-3195; see id. § 3181(a) (“The provisions of this chapter relating to the surren *1041 der of persons who have committed crimes in foreign countries shall continue in force only during the existence of any treaty of extradition with such foreign government.”)- The extradition judge is authorized only to “determine whether there is competent evidence to justify holding the accused to await trial.” Collins, 259 U.S. at 316, 42 S.Ct. 469. (As explained below, “competent evidence” is simply any evidence that has been certified in accordance with the extradition statute.) In making this assessment, the extradition judge does not weigh conflicting evidence presented by the fugitive or make credibility determinations based on that evidence. Barapind, 400 F.3d at 749-50. To the extent that an extradition judge is authorized to assess the credibility and reliability of the Government’s evidence, he or she does so based on an examination of that evidence under the terms of the governing treaty. Upon a showing of sufficiency, the inquiring magistrate judge is required to certify the fugitive as extraditable to the Secretary of State and to issue a warrant. 18 U.S.C. § 3184.
B. Probable Cause Standard of Proof
The Government (on behalf of the requesting country) bears the burden of submitting evidence that is “sufficient to sustain the charge [of criminality] under the provisions of the proper treaty or convention.” 18 U.S.C. § 3184. Extradition treaties, unlike criminal statutes, “should be liberally construed as to effect the apparent intention of the parties” — i.e., in favor of enforcement-as they are brokered “in the interest of justice and friendly relationships.” Factor, 290 U.S. at 293, 298, 54 S.Ct. 191. Courts are bound by this principle to “interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories.” Kin-Hong, 110 F.3d at 110 (quoting In re Extradition of Howard, 996 F.2d 1320, 1330-31 (1st Cir.1993)); accord Factor, 290 U.S. at 293-94, 54 S.Ct. 191.
Here, the Treaty requires that evidence be “sufficient, according to [United States] laws ... to justify the committal for trial of the person sought.” Treaty, art. 3. The Treaty further provides that
[w]hen the request for extradition relates to a person who has not yet been convicted, it shall be accompanied by ... [ejvidence which, in accordance with the laws of the [United States], would justify apprehension and commitment for trial of the person sought if the offense had been committed there.
Id., art. 10(3)(b) (emphasis added).
The standard of proof set forth in § 3190 and the Treaty allows for nothing more than an inquiry into whether probable cause exists to believe that the fugitive committed the alleged crimes. Probable cause exists when, under the “totality of the circumstances known to the [Government], a prudent person [knowing those facts] would have concluded that there was a fair probability that [the accused] had committed a crime.” United States v. Smith, 790 F.2d 789, 792 (9th Cir.1986); see Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).
In the context of evaluating the sufficiency of a criminal complaint, the Supreme Court framed the probable cause inquiry as simply: “What makes you think that the defendant committed the offense charged?” Jaben v. United States, 381 U.S. 214, 224, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965). This question, the Court explained,
does not reflect a requirement that the Commissioner ignore the- credibility of the complaining witness. There is a difference between disbelieving the affiant and requiring him to indicate some basis for his allegations. Obviously any reliance upon factual allegations necessarily *1042 entails some degree of reliance upon the credibility of the source. Nor does it indicate that each factual allegation which the affiant puts forth must be independéntly documented, or that each and every fact which contributed to his conclusions be spelled out in the complaint. It simply requires that enough information be presented to the Commissioner to enable him to make the judgment that the charges are not capricious and are sufficiently supported to justify bringing into play the further steps of the criminal process.
Id. at 224-25, 85 S.Ct. 1365 (internal citations omitted).
Here, the Government has answered the question — “What makes you think that the fugitive committed the offense charged?” — with affidavits from Hermosillo and her husband (Castellanos), from whom the ransom was extorted; authenticated confessions from Rosas and Hurta-do, two co-conspirators to the kidnapping who fingered the petitioner as the mastermind behind the abduction plan; an affidavit from Andrade, who identified the petitioner and Rosas in photographs as the men who approached him approximately one month before the kidnapping to ask if he was interested in “pulling a ‘job’.... to ask ‘Beto’ [Hermosillo’s husband] for two million pesos”; and an affidavit from a prosecutor from Mexico rebutting the allegations of torture. Extradition of Santos, 795 F.Supp.2d at 972-79 & n. 8.
The extradition court was not simply authorized to admit this evidence; it was obligated to do so under the Treaty. Treaty, art. 10(6)(b) (“The documents which, according to this Article, shall accompany the request for extradition, shall be received in evidence when ... they are certified by the principle diplomatic or consular officer of the United States in Mexico.”). It’s hard to imagine what more the Government would have to submit to satisfy the low threshold of probable cause.
C. Admissibility of Evidence
“The special and limited nature of extradition hearings is manifested in a more lenient standard for admissibility of evidence.” Kin-Hong, 110 F.Sd at 120. The Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not apply in the extradition context. Fed. R. Crim. P. 1(a)(5) (rules are not applicable to the “extradition and rendition of a fugitive”); Fed. R. Evid. 1101(d)(3) (same). Admissibility is instead controlled by § 3190.[7] Under that statute,
[depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the *1043 same, so offered, are authenticated in the manner required.
18 U.S.C. § 3190. Correspondingly, the Treaty provides that documents submitted in support of extradition “shall be received in evidence when ... certified by the principle diplomatic or consular officer of the United States in Mexico.” Treaty, art. 10(6)(b).
Unless the relevant treaty provides otherwise, the only requirement for admitting evidence is that the evidence be authenticated. Manta v. Chertoff, 518 F.3d 1134, 1146 (9th Cir.2008); see Man-Seok Choe v. Torres, 525 F.3d 733, 740 (9th Cir.2008); Oen Yin Choy v. Robinson, 858 F.2d 1400, 1406 (9th Cir.1988) (“We have indicated that authentication is the only requirement for admissibility of evidence under general United States extradition law.” (citing Emami v. United States Dist. Court for the N. Dist. of Cal., 834 F.2d 1444, 1451 (9th Cir.1987))). Thus, “competent evidence to justify holding the accused to await trial,” Collins, 259 U.S. at 316, 42 S.Ct. 469, is simply any evidence that has been certified in accordance with the extradition statute. The documents submitted by the Government comport with the requirements of § 3190. It bears repeating that the petitioner does not challenge the authentication of any of the Government’s documentation. The extradition judge was obligated to receive this evidence and assess whether the evidence adequately established probable cause. Upon receiving and examining the Government’s authenticated evidence, the magistrate determined that probable cause was established to hold the petitioner.[8]
Until today, we have rejected invitations to impose any additional requirement for admitting documentary evidence in an extradition proceeding. Barapind, 400 F.3d at 748. In Barapind, we stated:
[I]t is undisputed that the evidence presented against Barapind was properly authenticated pursuant to section 3190, and the Treaty itself contains no supplementary authentication requirements. We therefore reject Barapind’s claim that the extradition court erred in relying upon the authenticated documentary evidence submitted by India.
Id. Today, the majority recants these principled statements. The majority now requires that authenticated evidence must also satisfy the Fifth Amendment’s Due Process Clause. Maj. Op. 1003-04. The majority’s rationale conflicts with Supreme Court precedent holding that the right to extradite arises from — and only from — the treaty that created it. Factor, 290 U.S. at 287, 54 S.Ct. 191.
D. Limited Rights of the Fugitive
Because of the limited purpose of an extradition hearing and the comity owed other nations under an extradition treaty, a fugitive’s ability to present evidence is limited. In Loisel, the Supreme Court held that a fugitive does not have a broad right to present evidence at an extradition hearing. 259 U.S. at 315-17, 42 S.Ct. 469. The Court reasoned:
If [the right to introduce evidence in defense of the charged crime] were recognized as the legal right of the accused in extradition proceedings, it would give him the option of insisting upon a full hearing and trial of his case here; and that might compel the demanding government to produce all its evidence here, both direct and rebutting, in order to meet the defense thus gathered from *1044 every quarter. The result would be that the foreign government though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here. This would be in plain contravention of the intent and meaning of the extradition treaties.
Id. at 316, 42 S.Ct. 469 (quoting In re Wadge, 15 F. 864, 866 (S.D.N.Y.1883)); see also Charlton, 229 U.S. at 461, 33 S.Ct. 945. The Court further explained that evidence offered to “contradict” the government’s evidence was not properly admitted under this standard. Collins, 259 U.S. at 316, 42 S.Ct. 469.
For that reason, evidence that “goes to guilt or innocence or tends to contradict the requesting party’s case” — i.e., evidence that would lead to a material dispute over the truthfulness of proffered evidence— has been held to be inadmissible at an extradition hearing. Hooker, 573 F.2d at 1368; Barapind, 400 F.3d at 749-50; Desmond v. Eggers, 18 F.2d 503, 505 (9th Cir.1927) (“All of the authorities agree ... that matters which are only a defense to a trial on the merits are not admissible.”); In re Extradition of Zhenly Ye Gon, 613 F.Supp.2d 92, 102 (D.D.C.2009).
While a fugitive may introduce evidence explaining the evidence submitted by the requesting country, Barapind, 400 F.3d at 749, “explanatory” evidence has a narrow meaning in an extradition proceeding. “Explanatory” evidence is undisputed evidence that essentially accepts the substance of the requesting country’s evidence as true, but casts the requesting country’s evidence in a light that, although innocent, negates or “obliterates” the inference of guilt. See id.; see also Extradition of Glantz, No. 94 Crim. Misc. 1 P. 25, 1995 WL 495644, at *13 (S.D.N.Y. Aug. 21, 1995) (fugitive is “limited to attempting to offer a benign explanation of the evidence presented against him”); In re Ezeta, 62 F. 972, 986 (N.D.Cal.1894) (“explanatory” evidence “does not contradict or impugn testimony [submitted by] the prosecution”); Jacques Semmelman, The Rule of Non-Contradiction in International Extradition Proceedings: A Proposed Approach to the Admission of Exculpatory Evidence, 23 Fordham Int’l L.J. 1295, 1297 (2000) (describing “explanatory” evidence as evidence that “provides an innocent explanation for events that the government contends point toward guilt”).
The Government offers a useful hypothetical example of “explanatory” evidence:
A requesting country seeks extradition based solely on an eyewitness account of an apparent homicide at a train station. The requesting country proffers an eyewitness account, in which the witness reported standing near the train tracks and seeing two men farther down the train platform arguing with one another, and heard one man threaten to harm the other. As the train approached the platform, the witness turned away from the men for a moment, and when he turned back, he saw the man who had been threatened on the train tracks, where he was immediately struck by the train and killed. The requesting country inferred from the eyewitness account that the second man had pushed the victim onto the train tracks and charged the second man with murder. The accused man located security video footage of the train tracks (the authenticity of which was not disputed by the requesting country) and the video clearly showed that in the moment the witness looked away, the victim jumped onto the train tracks without any contact from the accused. *1045 Critically, the introduction of the uncontested security video would require no fact-finding, would not invite weighing of evidence, and would negate the only evidence of probable cause.
Government’s Answering Brief at 34, Santos v. Thomas, No. 12-56506 (9th Cir. Dec. 23, 2013) (emphasis added).
An extradition hearing cannot serve the purpose for which it was created if we require extradition judges to resolve evi-dentiary disputes. We have stated that “[t]he very purpose of extradition treaties is to obviate the necessity of confronting the accused with witnesses against him.” Mainero v. Gregg, 164 F.3d 1199, 1206 (9th Cir.1999). Requiring extradition judges to resolve evidentiary disputes would undermine this objective since rebutting a fugitive’s evidentiary challenge would necessitate that the requesting country send its evidence and witnesses to the United States to be (improperly) tested. As the Supreme Court has explained, the very point of extradition treaties would be defeated were the requesting country forced to bear this burden. Bingham, 241 U.S. at 517, 36 S.Ct. 634; see Benson, 127 U.S. at 463, 8 S.Ct. 1240 (“We are not sitting in this court on the trial of the prisoner, with power to pronounce him guilty and punish him or declare him innocent and acquit him.”). It is this foreseeable burden that animates the distinction between “contradictory” evidence and “explanatory” evidence.
In this case, the petitioner sought to admit self-serving statements by Hurtado and Rosas that recant their prior confessions inculpating the petitioner for kidnapping. The disputed recantations are “contradictory,” as even the majority admits. Maj. Op. 1002. The majority labors to surgically detach the assertions of torture from the recanted assertions contained in the very same documents. Maj. Op. 1002-04. The assertions of torture, the majority contends, are “explanatory” rather than “contradictory” evidence because they suggest that a due process violation has occurred. The characterization is flawed, and the operation a failure, for multiple reasons.
The majority assumes that due process afforded at an extradition proceeding is the same due process afforded at a criminal trial, but this is not true. The Supreme Court has likened an extradition proceeding to a grand jury investigation into the existence of probable cause. See Bingham, 241 U.S. at 517, 36 S.Ct. 634; Charlton, 229 U.S. at 459-62, 33 S.Ct. 945. It is well settled that the target of a grand jury investigation has no right to present any evidence to the grand jury, even if that evidence would completely undermine the government’s evidence. The defendant in an extradition hearing, however, may present “explanatory” evidence, but only “explanatory” evidence. Anything more forces an extradition judge to conduct a mini-trial into the probative value of the proffered evidence — the very procedure disapproved by the Supreme Court.
Moreover, the Supreme Court has held that a number of Constitutional rights are not cognizable in extradition hearings. For example, while it violates due process to try a person who is so mentally incompetent that he cannot assist with his defense, the Supreme Court in Charlton held that a fugitive had no right to introduce evidence of insanity at his extradition hearing. 229 U.S. at 462, 33 S.Ct. 945. Similarly, due process may protect a criminal defendant from excessive pre-accusation delay by the prosecution, e.g., United States v. Lovasco, 431 U.S. 783, 788-89, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), but we have held that “the [U.S.] Constitution does not of its own force impose on foreign governments the obligation to act speedily in seeking extradition of a fugitive from the United *1046 States,” In re Extradition of Kraiselburd, 786 F.2d 1395, 1398 (9th Cir.1986) (no constitutional or treaty violation simply because extradition was requested five years after offense occurred).[9] Thus, contrary to the majority’s assumption, the Judiciary has no obligation to ensure that an extradition request or evidence submitted to show probable cause does not violate our Constitution. Its obligation is to ensure that an extradition request does not violate the extradition statute or the governing treaty.
Critically, labeling the proffered evidence as going to the “competence of the government’s evidence” does not, as the majority suggests, magically or otherwise make the evidence “explanatory” rather than “contradictory.” Maj. Op. 1002-03. The litmus test is whether, as a practical matter, the admission of the evidence will result in a mini-trial. Collins, 259 U.S. at 315-16, 42 S.Ct. 469; Charlton, 229 U.S. at 460-62, 33 S.Ct. 945; Benson, 127 U.S. at 463, 8 S.Ct. 1240; Barapind, 400 F.3d at 749-50. If the evidence would compel such a trial, the evidence is “contradictory.” Here, the majority contends that the extradition judge must consider the petitioner’s evidence, even though it contradicts Mexico’s medical evidence showing the absence of physical injuries shortly after the torture allegedly occurred.[10] Once the extradition judge “considers” the allegations of duress, Mexico will likely feel obligated to “produce all its evidence here, both direct and rebutting, in order to meet the [allegations].” Collins, 259 U.S. at 316, 42 S.Ct. 469. As forewarned by the Supreme Court, “[t]he result would be that the foreign government ... would be compelled to go into a full trial” on the duress issue. Id. Indeed, an improper mini-trial is likely to result even if, as the majority holds in conclusory fashion, the extradition judge may certify extradition in cases where the allegations do not credibly allege torture on their face. Maj. Op. 1007-08. Foreign governments seeking extradition are unlikely to let allegations of torture lie unanswered, and the credibility of conflicting evidence simply cannot be determined without a trial. The majority has not explained how, in this situation, a mini-trial could be avoided.
The majority, perhaps recognizing the impracticality of its approach, attempts to cabin its holding. It states:
Where an extradition court first considers evidence that a statement was improperly obtained, but concludes that it is impossible to determine the credibility of the allegations without exceeding the scope of an extradition court’s limited review, the court has fulfilled its obligation — as the extradition court did in Barapind.
Maj. Op. 1007. This distinction is illusory. Given the Government’s evidence and the torture evidence proffered in this case, how could the extradition court determine the credibility of the evidence of torture without holding a minitrial — in other *1047 words, “without exceeding the scope of an extradition court’s limited review?”
Under the guidance of the Supreme Court, courts have attempted to draw a bright line between “explanatory” evidence and “contradictory” evidence. As explained above, the cases and supporting literature indicate that “explanatory” evidence is undisputed evidence that accepts the requesting country’s evidence as true and casts such evidence in an innocent light while simultaneously negating the inference of guilt. See Collins, 259 U.S. at 315-16, 42 S.Ct. 469 (fugitive permitted to testify “to things which might have explained ambiguities or doubtful elements in the prima facie case made against him” — i.e., “evidence bearing upon the issue of probable cause”); Barapind, 400 F.3d at 749; see also Extradition of Glantz, 1995 WL 495644, at *13 (fugitive is “limited to attempting to offer a benign explanation of the evidence presented against him”); Ezeta, 62 F. at 986 (“explanatory” evidence “does not contradict or impugn testimony [submitted by] the prosecution”); Semmelman, supra, at 1297 (“explanatory” evidence is evidence that “provides an innocent explanation for events that the government contends point toward guilt”).[11] Such evidence requires no fact-finding and would not invite the weighing of evidence.
Of course the deference that the requesting country enjoys does not mean that an extradition judge must accept unsubstantiated or otherwise insufficient allegations of criminality. Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).[12] “The improbability or the vagueness of the testimony [relied upon by the requesting country] may destroy the probability of guilt.” Shapiro v. Ferrandina, 355 F.Supp. 563, 572 (S.D.N.Y.1973). Likewise, probable cause may not exist where an accusation of criminality has been lodged for which there is insufficient evidence. Man-Seok Choe, 525 F.3d at 738. Where, as here, the accusation has been substantiated, probable cause may be defeated by showing that the evidence was not properly authenticated or by challenging its sufficiency on some other ground that does not involve the proffering of competing evidence tending to contradict the Government’s evidence.
V. Deference to the Mexican Courts
In extradition proceedings, the responsibility for addressing proffered evidence of torture rests with the requesting country. *1048 In recognition of this principle, Justice Holmes stated: “[I]f there is presented, even in somewhat untechnical form according to our ideas, such reasonable ground to suppose [a fugitive] guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender.” Glucksman, 221 U.S. at 512, 31 S.Ct. 704. Such deference arises from the comity shared between Treaty partners as well as case law acknowledging that the courts of the requesting country, having full access to the necessary evidence and witnesses, are better qualified than we are to consider the fugitive’s allegations. Where, at the behest of a foreign state, the Executive branch requests extradition, it is for the courts in the requesting country to determine whether law enforcement agents in that country have procured evidence improperly and, if so, whether any impropriety so taints the evidence that it should not be considered.
Consistent with the determination previously made by the Executive and Legislative branches, we must accept that the Mexican legal system can be relied on to adjudicate the petitioner’s claims fairly. See Spatola v. United States, 741 F.Supp. 362, 371 (E.D.N.Y.1990), aff'd, 925 F.2d 615 (2d Cir.1991) (“[A] judicial proceeding in extradition is not the proper vehicle for challenging or questioning the fairness of another country’s criminal justice system.”). Indeed, here the Mexican courts have already granted the petitioner relief on the homicide charge that was originally brought against him.
VI. Conclusion
“The principles of international law recognize no right to extradition apart from treaty.” Factor, 290 U.S. at 287, 54 S.Ct. 191. “To determine the nature and extent of that right,” therefore, “we must look to the treaty which created it.” Id. The Extradition Treaty between the United States and Mexico has been in full force and effect since 1980. In it the nations have “agree[d] to mutually extradite, subject to the provisions of this Treaty, persons who the competent authorities of the requesting Party have charged with an offense.” Treaty, art. 1. Our system of government demands that the Judiciary yield to this arrangement.
The record in this case consists of documentary evidence submitted by Mexico that comports with § 3190 and Article 10(6)(b). As such, the evidence meets the competency test and was properly admitted. The evidence established probable cause that the petitioner abducted Hermosillo and her two daughters for ransom in Mexico. When the extradition judge excluded the petitioner’s competing evidence in defense, he did so consistent with his limited role under § 3184. Indeed, this ruling was compelled by the Supreme Court’s longstanding extradition jurisprudence. See Fernandez, 268 U.S. at 312, 45 S.Ct. 541; Collins, 259 U.S. at 316, 42 S.Ct. 469; Bingham, 241 U.S. at 517, 36 S.Ct. 634; Charlton, 229 U.S. at 457-58, 461-62, 33 S.Ct. 945. The ruling cannot be overturned under the extradition statute or governing treaty, unless principles of statutory construction and international comity “are now to be discarded.” Factor, 290 U.S. at 294, 54 S.Ct. 191; cf. Ward, 921 F.2d at 287 (citing plain meaning of § 3184 as justification for upholding “constitutionality of assigning extradition requests to a United States magistrate”).
A defendant’s ability to offer evidence in an extradition proceeding is limited to “explanatory” evidence. This is evidence that accepts the requesting country’s evidence as true and casts the requesting country’s evidence in an innocent light, while at the same time negating the inference of guilt. The test for determining whether the proffered evidence is “explanatory” or “contradictory” is whether its admission will re *1049 quire a mini-trial. See Collins, 259 U.S. at 315-16, 42 S.Ct. 469; Charlton, 229 U.S. at 460-62, 33 S.Ct. 945; Benson, 127 U.S. at 463, 8 S.Ct. 1240; Barapind, 400 F.3d at 749-50. Here, there can be no doubt that the required admission of “contradictory” torture evidence demands a mini-trial. There is no other way of determining whether the authenticated statements were coerced as the petitioner contends, or whether they were voluntarily given, as Mexico asserts.
I am not immune from the “natural anxiety” the majority has in wanting to investigate the allegations of torture raised in this case. Fernandez, 268 U.S. at 312, 45 S.Ct. 541. But our concern does not justify abandoning the limited role we play in the extradition process. The extradition judge determines only whether the authenticated evidence establishes probable cause to believe the fugitive committed the crime, much like a grand jury returns an indictment, looking only at the evidence presented by the government. See Bingham, 241 U.S. at 517, 36 S.Ct. 634; Charlton, 229 U.S. at 459-62, 33 S.Ct. 945. Although allegations that the authenticated evidence was procured by torture can be troubling, in extradition proceedings we must trust the Executive branch and the judicial system of the requesting country to determine the veracity of such allegations and the attendant consequences. Because the majority would have the Judiciary convert extradition proceedings into minitrials— contrary to the provisions of the Treaty, the extradition statute and Supreme Court precedent — I dissent.

. Hermosillo’s younger daughter died during the course of the kidnapping. Mexico initially charged the petitioner with kidnapping and homicide, but the charge was ultimately reduced to kidnapping alone.

. The Treaty was signed and ratified by President Jimmy Carter with the consent of the Senate, and entered into force on January 25, 1980.

. It appears that the extradition judge also excluded "voluminous additional evidence” offered to "enhance the reliability” of the recantations and allegations of torture and coercion. Extradition of Santos, 795 F.Supp.2d at 988, 990 ("Munoz’s evidence offered to show that the inculpatory statements relied on by the government to establish probable cause were recanted and were procured through torture or coercion is inadmissible and has not been considered in determining probable cause.”). As stated by that court:
The additional evidence includes, but is not limited to: (1) additional declarations by Munoz, Hurtado, and other witnesses who had some connection to Munoz or his co-defendants in the criminal case in Mexico; (2) newspaper articles identifying Hermosillo's husband’s brother as a suspected drug dealer who reportedly attacked Mexican soldiers; (3) copies of reports of forensic medical examinations of Munoz; (4) bank records, hotel records, Western Union records, and similar evidence offered to establish alibi defenses by Munoz or his co-defendants; (5) Mexican court documents showing that an appeals court reversed the kidnapping conviction of Lopez Mendivil, acquitted her, and ordered her immediate release from custody; and (6) reports on human rights practices in Mexico prepared by the U.S. Department of State, Bureau of Democracy, Rights, and Labor.
Id. at 988.

. Curiously, in their initial recantations, both Hurtado and Rosas stated that they were tortured sometime between March 19 and March 22, 2006, the precise time-frame during which they were medically examined. They adjusted this time-line in later amendments to their statements.

. At the extradition hearing, counsel for the petitioner stipulated that all elements, except the element of probable cause, had been satisfied. Id. at 970.

. In Munaf, the Supreme Court noted that "the Solicitor General statefd] that it is the policy of the United States not to transfer an individual in circumstances where torture is likely to result.” 553 U.S. at 702, 128 S.Ct. 2207. Although the prospect of future torture is not the subject of this appeal, it is worth noting that the petitioner raised this claim on his own behalf to the extradition court. There, he argued that his extradition should be denied under the United Nations Convention Against Torture " '[gjiven the record of torture and death threats' in this case,” and because " 'it is extremely likely that [he] and his family will be subjected to grievous harm' in the form of torture, threats, and even assassination if he were returned to Mexico.” Extradition of Santos, 795 F.Supp.2d at 990.

. Citing the predecessor statute to 18 U.S.C. §3190, which mandates the admission of a requesting country’s supporting documents if they have been certified through diplomatic channels, the Supreme Court in Bingham explained:
It is one of the objects of § 5170 [today, § 3190] to obviate the necessity of confronting the accused with the witnesses against him; and a construction of this section, or of the treaty, that would require the demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty.
241 U.S. at 517, 36 S.Ct. 634; see Yordi v. Nolte, 215 U.S. 227, 231, 30 S.Ct. 90, 54 L.Ed. 170 (1909).

. Although authenticated evidence is admissible, admissibility by itself is not the test for probable cause. In cases where the Government’s evidence has been authenticated and admitted but nevertheless fails to satisfy probable cause, an extradition judge may not certify extradition. This is not one of those cases, however.

. See also In re Extradition of Drayer, 190 F.3d 410, 415 (6th Cir.1999) (14-year delay between crime and extradition request did not violate due process); Martin, 993 F.2d at 825 (17-year delay in bringing extradition request did not bar extradition; neither treaty nor due process afforded right to speedy extradition); In re Burt, 737 F.2d 1477, 1482, 1486-87 (7th Cir.1984) (no violation of due process to extradite fugitive even though extradition request was made 16 years after commission of crime); Kamrin v. United States, 725 F.2d 1225, 1227-28 (9th Cir.1984) (due process protections not applicable and did not bar extradition where Australia sought extradition eight years after crime occurred).

. Lest we lose sight of the quantity of evidence facing the judge in this case, this evidence includes all of the additional volumes of documentary evidence proffered by the petitioner, but not raised on appeal, in supporting the allegations of torture. Extradition of Santos, 795 F.Supp.2d at 988.

. Failure to adhere to this narrow definition could yield unintended results. It is not clear what estoppel or preclusive effect an extradition judge's evidentiary ruling could have in the criminal courts of the requesting country.

. Several courts have concluded that evidence proffered by the extraditing state should be deemed truthful by the extradition judge when assessing probable cause. See In re Extradition of Atta, 706 F.Supp. 1032, 1050-51 (E.D.N.Y.1989) (noting that evidence contained in the extradition request “is deemed truthful for purposes of this determination” (citing Loisel, 259 U.S. at 315-16, 42 S.Ct. 469)); In re Solis, 402 F.Supp.2d at 1132; In re Extradition of Cheung, 968 F.Supp. 791, 794 n. 6 (D.Conn.1997); Marzook v. Christopher, 924 F.Supp. 565, 592 (S.D.N.Y.1996) ("I must accept as true all of the statements and offers of proof by the demanding state.”); Desautels v. United States, 782 F.Supp. 942, 944 n. 2 (D.Vt.1991). This view has been held to be consistent with the Supreme Court's approach in domestic extradition cases. In re Extradition of Singh, 124 F.R.D. 571, 577 (D.N.J.1987) (citing California v. Superior Court of Cal., San Bernardino Cty., 482 U.S. 400, 409, 107 S.Ct. 2433, 96 L.Ed.2d 332 (1987) ("If we accept as true every fact alleged, [the fugitives whose extradition from California was sought by Louisiana] are properly charged with kidnapping under Louisiana law. In our view, this ends the inquiry into the issue of whether or not a crime is charged for purposes of the Extradition Act [18 U.S.C. § 3182].”)).